GREENBERG TRAURIG, LLP
David D. Cleary, AZ SBN 011826
clearyd@gtlaw.com
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Telephone: 602-445-8000
Facsimile: 602-445-8100

*[Proposed] Attorney for Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>Prime Time International Company, an Arizona corporation,[1]<br><br>Debtors and Debtors-in-Possession. | Case No. 2:14-bk-03518(SSC)<br>Chapter 11 |
| In re:<br>21st Century Brands, LLC, an Arizona limited liability company,[2]<br><br>Debtors and Debtors-in-Possession. | Case No. 2:14-bk-03519(RJH)<br>Chapter 11 |
| In re:<br>USA Tobacco Distributing, Inc. an Arizona corporation,[3]<br><br>Debtors and Debtors-in-Possession. | Case No. 2:14-bk-03520 (SSC)<br>Chapter 11<br><br>**DECLARATION OF JOHN T. WERTHEIM IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR RELIEF** |

[1] The last four digits of Prime Time International Company, Inc.'s taxpayer identification number is 6454 and its address is 2019 W. Lone Cactus Drive, Phoenix, Arizona 85027.
[2] The last four digits of 21st Century Brands, LLC's taxpayer identification number is 4475 and its address is 2019 W. Lone Cactus Drive, Phoenix, Arizona 85027.
[3] The last four digits of USA Tobacco Distributing, Inc.'s taxpayer identification number is 1225 and its address is 2019 W. Lone Cactus Drive, Phoenix, Arizona 85027.

ЧX 331025046v9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**JOHN T. WERTHEIM** hereby declares, under penalty of perjury, as follows:

## I.
## INTRODUCTION

1.      Prime Time International Company, Inc. f/k/a Single Stick, Inc., an Arizona corporation ("**PTIC**") manufactures tobacco products under a permit issued by the U.S. Alcohol and Tobacco Tax and Trade Bureau. Its wholly owned subsidiary, USA Tobacco Distributing, Inc. an Arizona corporation, ("**USA**") is licensed as a distributor for PTIC tobacco products in most states. 21st Century Brands, LLC, an Arizona limited liability company, ("**Century Brands**") was formed as a wholly owned subsidiary of PTIC to manufacture and sell non-tobacco products. Collectively, these three companies, (collectively referred to herein as the "**Company**") manufacture and distribute tobacco, primarily cigars, and non-tobacco products, primarily energy products, throughout the US and to certain foreign customers.

2.      The Company has annual sales of approximately $40 million dollars and sells its products in approximately 100,000 convenience stores in North America. The Company has direct accounts with each of the top 25 largest convenience store ("**C-Store**") distributors in the United States. The Company's products are carried by 62 of the top 100 convenience store chains in the United States. In addition, Prime Time® Cigars are the market leader in Canada with over 30% of the total market share. The Company currently employs approximately 73 people including an experienced sales force of 25 people.

*PHX 331025046v9*

-2-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## II.
## BACKGROUND

A.    Overview of the Debtors

3.      PTIC and USA were each incorporated in 1993 and are headquartered in a 17,000 square foot leased facility in Phoenix, Arizona. The Company began its business by selling singly packaged cigarettes to consumers who desired to buy less than 20 cigarettes in a pack.  Since then, the Company has continued to improve its business model, diversify its brands and remain current with its customers, vendors and secured lender.  The imposition of tobacco-related assessments, which are disputed and subject to litigation, has hampered the Company's ability to refinance its secured debt and expand its operations.

4.      In 1998, the cigarette laws were changed prohibiting the sale of less than 20 cigarettes in a pack. At that time, the Company's product line evolved as it began selling flavored cigars. The Company eventually expanded into multiple cigar styles and brands. The Company's cigar brands include Prime Time® Cigars, Smoker's Choice® (under trademark license), PT Rillos®, Bullseye®, Sparrow® Pipe Tobacco Cigars and Gold Rush®.

5.      In 2005, due to the strong demand for the Company's products and difficulties with outsourcing the manufacturing, the Company leased, with an option to purchase, a complete line of tobacco manufacturing equipment in a leased 60,000 square foot tobacco manufacturing plant in Stantonsburg, N.C. In 2007, the Company exercised the purchase option, and added a 20,000 square foot addition to the warehouse.

6.      The Company spent considerable time and resources building its distributor and chain networks to achieve a national and international presence for most of its product lines.  The

-3-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1   Company hired experienced sales personnel who had personal relationships with major national

2   accounts, which proved to be a key factor to the Company's success.

3       7.      As a result, the Company experienced significant growth and profitability until the

4   passage of the State Children's Health Insurance Program Reauthorization Act ("**SCHIP**") in

5   February, 2009. This law provided for federal financing of children's health insurance and

6   increased the federal excise tax on little cigars over 2,600% (from $0.36 to $10.00 per carton)

7   causing severe economic damage to PTIC and the loss of untold jobs throughout the

8   manufacturing and supply chain. In 2009, little cigars represented 98.5% of PTIC's volume of

9   cigars. Additional losses directly to the Company were incurred by reason of trade credits for

10  substantial returns of product which became unsaleable due to the radical tax increases due to

11  SCHIP.

12      8.      In late 2009, reacting to the impact of the SCHIP legislation, the Company made

13  the decision to diversify its product offerings both in the tobacco and non-tobacco categories to

14  attempt to minimize the impact that future regulatory and tax legislation might have on the

15  Company's product lines. Due to strong customer demand, the Company made a major shift into

16  making and selling large machine made cigars. The Company also diversified into pipe tobacco

17  by launching its Sparrow® Pipe Tobacco brand to help with its diversification program.

18      9.      Additionally, the Company formed 21st Century Brands, LLC as a wholly owned

19  subsidiary of PTIC for the purpose of manufacturing and selling non-tobacco products. The initial

20  product was an energy shot, trademarked as e6® which quickly became the sixth largest energy

21  shot brand in the United States.

22      10.     In April 2010, Canadian legislation (Bill C-32) became effective prohibiting the

23  sale and importation of filtered flavored cigars weighing less than 1.4 milligrams per stick. The

*PHX 331025046v9*

Company re-engineered its Canadian cigars to comply with the new Canadian law and re-introduced the new products to the Canadian market.

11.     Due to these efforts, 2012 was a profitable year for the Company.   However, ongoing litigation, as discussed below, prevented further expansion or funding for diversification or refinancing of the Company's secured debt.

12.     In November 1, 2013 the Company's line of credit facility with JP Morgan Chase Bank ("**Chase**") became due, and Chase refused the Company's request to refinance the outstanding balances. The Company, however, remains current on its payables and anticipates a profitable 2014 from normalized operations. As necessary, management will continue to cut costs to reduce the monthly overhead until the Company is confident that monthly sales have stabilized, or are showing trends of a sustainable growth and profitability. The Company's primary objective in the near term is to find a suitable financial institution to replace its secured lender, obtain additional capital to assist in marketing, and continue to operate the Company profitability through the resolution of an appropriate assessment amount with the United States Department of Agriculture (the "**USDA**").

**Litigation with the USDA**

13.     The Fair and Equitable Tax Reform Act of 2004 ("**FETRA**") provided for the termination of the federal tobacco quota system and established a transition program to pay farmers for the terminated quotas through the assessment of manufacturers and importers of tobacco products. The interpretation of this legislation by the USDA resulted in a dispute with PTIC over the assessment methodology relating to the Company's small cigar product, which at the time represented most of the Company's business. Specifically, the agencies' decision to treat large and small cigars equally in the overall cigar class assessment, created large disparities

*PHX 331025046v9*

-5-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

between products, both in terms of weight and in terms of the contribution of different types of products to the class assessment. The Company contended that the USDA assessment methodology directly contradicted the plain language of the statute that no company should be assessed in excess of their market share of gross domestic volume of tobacco sold. The Company, after exhausting its administrative appeals, filed suit against the USDA in the District Court for the District of Columbia.

14.     In March 2010, as the result of the Company's appeal of a lower court decision, the U.S. District Court of Appeals for the District of Columbia (the "**Court of Appeals**") ruled, in the Company's litigation against the USDA, that PTIC's assessment methodology complied with the full extent of FETRA, and the USDA's methodology did not comply. The Court of Appeals remanded the case back to the USDA to reconsider their methodology. Based on PTIC's methodology, the Company had substantially over paid the USDA. The Company stopped paying the USDA's disputed quarterly assessment (as calculated by the USDA). The Company, however, continues to expense the USDA assessments on its books per the USDA invoices, with the result that the Company's profit and loss statements would be substantially under stated if the Company is ultimately successful in the litigation against the USDA. For tax purposes, the Company is currently unable to deduct the unpaid USDA assessments and therefore has paid considerable taxes through the years on the unpaid assessments.

15.     After receiving the successful decision from the Court of Appeals, the case was remanded to the USDA to adopt a method of assessment that would be consistent with the statute. The USDA responded by publishing a Notice of Determination readopting the same assessment methodology that the Court of Appeals had deemed to be flawed. Concurrently with this publication, and responsive to the excessive delays by the USDA, the Company filed a Motion for

Summary Judgment in the FETRA litigation with the USDA. The Company's Motion requested cancellation of the excessive assessments by the USDA following the Court of Appeals decision, and judgment for overpayments made by the Company to the agency.

16. On June 6, 2012 the USDA filed additional litigation requesting judgment against the Company, again based on USDA's FETRA assessment methodology, for $11.7 million for the assessed amounts which the Company had accrued. This case was consolidated by the District Court with the Company's suit challenging the USDA methodology.

17. On June 10, 2013, the District Court entered a judgment against the Company. The Company noticed an appeal to the Court of Appeals, which as noted above had previously issued a favorable opinion to the Company's position. This matter is fully briefed and will be set for hearing.

18. The pendency of the USDA lawsuit has been a major impediment to the Company's efforts to seek additional investors and/or a different banking relationship to provide capital to sustain the growth of the Company and to refinance the existing bank loans.

**B. Corporate Structure**

19. PTIC holds all of the stock of USA and all of the interests in Century Brands. Over seventy-seven (77) individuals hold stock in PTIC.

**C. Prepetition Capital Structure**

20. In addition to normal course costs of operations, market development and product enhancements, the Debtors have long term debt pursuant to certain loans made to the Debtors by JPMorgan Chase Bank, N.A. ("**Chase**" or the "**Prepetition Lender**"). That debt is comprised of: (i) a loan made by Chase to the Debtors in the original principal amount of $3,500,000 (the "**Facility A Loan**") which is evidenced by, among other things, (x) that certain Credit Agreement

-7-

*PHX 331025046v9*

Case 2:14-bk-03518-MCW    Doc 4    Filed 03/15/14    Entered 03/15/14 16:39:21    Desc
Main Document    Page 7 of 38

by and between PTIC and Chase dated May 13, 2011 (the "**Credit Agreement**") and (y) that certain Promissory Note by PTIC in favor of Chase dated May 13, 2011; (ii) a loan made by Chase to the Debtors in the original principal amount of $1,140,912.50 (the "**Facility B Loan**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated February 2, 2009; (iii) a loan by Chase to the Debtors in the original principal amount of $2,200,000.16 (the "**Facility C Loan**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated October 7, 2011 and (iv) a loan made by Chase to PTIC in the original principal amount of $100,000 (the "**Equipment Loan**, and together with the Facility A Loan, the Facility B Loan and the Facility C Loan, the "**Loans**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated November 28, 2011.

21.     As of the Petition Date, the Debtors are indebted to the Prepetition Lender in principal amount of not less than $3,503,704 as a result of the Loans.

**D.      Events Leading to the Chapter 11 Filing**

22.     During the assessment litigation, the USDA has refused a Company request for a standstill agreement as well as offers by the Company to make partial payments to the USDA during the pendency of the appeal process.  Further, the USDA informed the Company that the USDA intended to take action to enforce the alleged outstanding amounts owed to them before the final determination of the litigation before the Court of Appeals, despite the fact that the appeal is fully briefed and the USDA program ends in September of 2014, after which there will be no further assessments.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331025046v9

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

23. Further, although PTIC has never experienced a payment default, the Company recently tripped several loan covenants. Chase informed the Company that it has decided not to renew the Company's working capital line of credit and sent PTIC a notice of default under the existing loan agreements. The Company and Chase negotiated a forbearance agreement which will expire at the end of March, 2014.

24. The Company is a successful business operation with over $37 million in sales last year. It employs over seventy-three (73) people. With the ability to restructure its capital structure and liquidate a proper assessment amount, the Company can successfully restructure its operations. The Company believes the business has significantly more value as a going concern than if it were to liquidate its business and assets. Retention and growth of the existing distributor and chain networks utilizing the existing sales force is a key factor to obtaining a potential acquirer/investor for an exit strategy. Moreover, the Company believes this reorganization will allow it the opportunity to continue to increase its strength, improve operating margins, and ultimately provide all parties in interest significantly more dollar payments through its plan of reorganization than would be realized in the event of forced liquidation.

## III.
## FIRST DAY MOTIONS [4]

25. Concurrently with the filing of the voluntary petitions to commence these cases, the Debtors will be filing a number of First Day Motions. The Debtors anticipate that the Bankruptcy Court will conduct a hearing within a business day or two after the commencement of the cases (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

---

[4] Capitalized terms used in Part III and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

PHX 331025046v9

-9-

26. Generally, the First Day Motions have been designed to meet the immediate goals of (a) establishing procedures for the efficient administration of these Chapter 11 Cases; (b) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtors' key constituencies. I have reviewed each of the First Day Motions, including the exhibits, attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Chapter 11 Cases.

27. The First Day Motions are summarized below:

**A.** **Debtors' Emergency Motion for Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only**

28. By this motion, the Debtors request the joint administration of the Debtors' related chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Debtors' cases under the Prime Time International Company case and also request that the caption of their cases be modified to reflect the joint administration of the cases.

29. USA Tobacco and Century Brands, LLC (collectively, the "**Subsidiaries**") are direct or indirect wholly owned subsidiaries of PTIC, such that the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2).[5] Joint administration of these cases (a) is warranted because the Debtors' financial affairs and business operations are closely related,

---

[5] Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor…" 11 U.S.C. § 101(2).

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331025046v9

-10-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    and (b) will avoid the unnecessary administrative burden on the Court and parties-in-interest in

2    these Chapter 11 Cases.

3          30.     Joint administration will permit the Clerk to use a single general docket for the

4    Debtors' Chapter 11 Cases and to combine notices to creditors and other parties-in-interest of the

5    Debtors' respective estates. Joint administration also will protect parties-in-interest by ensuring

6    that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised

7    of the various matters before the Court in each of the Chapter 11 Cases.

8

9          31.     I understand that if the Court approves joint administration of the Debtors' cases,

10    the Debtors will be able to reduce fees and costs resulting from the administration of these

11    Chapter 11 Cases and ease the onerous administrative burden of having to file multiple

12    documents. I have also been advised that joint administration will ease the administrative burden

13    for the Court and all parties to these cases and obviate the need for duplicative notices, motions,

14    applications and orders, and thereby save time and expense for the Debtors and their estates.

15

16          32.     Based on the foregoing, the Debtors believe that joint administration of the cases is

17    in the best interests of the Debtors, their estates and all parties in interest, and should be granted

18    in all respects.

19    **B.     Debtors' Emergency Motion for Interim and Final Orders Authorizing Use of Cash
          Collateral, Granting Adequate Protection and Setting Final Hearing**

20

21          33.     By this motion, the Debtors request the Bankruptcy Court's approval of the use of

22    Cash Collateral which is critical to the Debtors' efforts to reorganize and maximize value for their

23    estates, employees and creditors.

24

25

26

-11-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1. ***Prepetition Secured Debt***

34.     On the Petition Date, the Debtors were obligated on approximately $3,503,704 as a result of the Loans.

2. ***Use of Cash Collateral***

35.     The availability to the Debtors of sufficient working capital, liquidity, and other financial accommodations are vital to their ability to continue their operations.  The Debtors do not have sufficient available sources of working capital and financing to carry on the normal course operation of their businesses without use of the Cash Collateral.  The Debtors ability to maintain business relationships with their vendors, suppliers, and customers, and to finance their day-to-day operations, is essential to the Debtors' continued viability.  In addition, the Debtors need for use of Cash Collateral is critical and immediate. In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible.  Accordingly, the Debtors and their estates would suffer immediate and irreparable harm unless the Debtors are authorized to use Cash Collateral on the terms and conditions set forth herein and in accordance with the Initial Budget.  If the Debtors are not authorized to use Cash Collateral, the Debtors' businesses will shut down.  The use of Cash Collateral, therefore, is critical to the Debtors' ability to operate their businesses going forward and to maximize the value of their assets for the benefit of their creditors

36.     Given the Debtors' current financial condition, financing arrangements, and capital structure, the Debtors have been unable to obtain financing from sources on terms more favorable than provided for in Cash Collateral Motion and the Proposed Interim Order.  The Debtors likewise have been unable to obtain unsecured credit allowable under Section 364(b)(1) of the Bankruptcy Code as an administrative expense.

-12-

37.     The terms of the Cash Collateral arrangement described in the Motion were negotiated by the parties in good faith and at arm's length and the Debtors believe they are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

38.     The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the authorized use of Cash Collateral.  Absent obtaining use of Cash Collateral, the Debtors' businesses will be shut down, their ability to reorganize or realize going concern value in their enterprises will be hindered, and serious and irreparable harm to the Debtors, their estates and their creditors and equity holders will occur.  The preservation and maintenance of the Debtors' businesses and their assets is necessary to maximize returns for all creditors, and is significant and necessary to a successful resolution of these cases.

C.     **Debtors' Emergency Motion for Interim and Final Orders Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms**

39.     By this motion, the Debtors seek an order: (a) authorizing the Debtors to maintain and continue using their existing bank accounts, as identified in the motion (the "**Bank Accounts**"), and cash management system as set forth in the motion; (b) authorizing the Debtors to continue using their existing business forms until they are depleted, at which time new forms will be ordered with the designation "Debtor-in-Possession" imprinted on them; (c) authorizing the Debtors' banks to honor postpetition checks, if any, drawn on and transfers made from the Debtors' accounts; and (d) granting the banks identified in the motion limited relief from the automatic stay to continue to deduct monthly bank fees from the Bank Accounts in the same

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-13-

PHX 331025046v9

Case 2:14-bk-03518-MCW    Doc 4    Filed 03/15/14    Entered 03/15/14 16:39:21    Desc
Main Document    Page 13 of 38

manner as such fees were deducted prepetition, whether such fees were incurred prepetition or postpetition.

40. As described in the Cash Management Motion, the Debtors' cash management system is necessary not only for the efficient functioning of the Debtors' business, but it is also necessary to ensure the timely payment of excise taxes to the state and federal governments. For an enterprise like the Debtors, whose operations are so highly dependent on their ability to manage the high volume of cash receipts and cash disbursements received and made on a daily basis, maintaining their existing cash management system is crucial.

41. Prior to the commencement of the Chapter 11 Cases, and in the ordinary course of their businesses, the Debtors operated Bank Accounts with JP Morgan Chase Bank, N.A. ("**Chase**"), Comerica, Inc. ("**Comerica**"), Enterprise Bank & Trust ("**Enterprise**"), and BB&T Corporation ("**BB&T**"). The Bank Accounts are part of a carefully constructed and highly-automated cash management system (the "**Cash Management System**") that ensures the Debtors' ability to efficiently monitor and control their cash position. The Debtors' Cash Management System is maintained primarily with Chase.

42. PTIC has two accounts with Chase, a concentration account (the "**Concentration Account**") and a payroll account (the "**Chase Payroll Account**"). The Concentration Account serves as PTIC's primary operating account and PTIC transfers funds from the Concentration Account to the Chase Payroll Account according to PTIC's anticipated cash requirements for certain payroll and other employee expenses. The Chase Payroll Account, a zero-balance account that is funded from the Concentration Account, provides for the payment of payroll and other employee obligations.

-14-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

43.     PTIC also maintains one account with Comerica, an escrow/interest account (the "**MSA Account**").  The MSA Account is an escrow account which maintains funds related the settlement of state tobacco litigation against the major tobacco manufacturers for recovery of tobacco related health care costs.  The funds in the MSA Account are restricted and the Debtors are not able to access those funds.  The accrued interest from the MSA Account is accumulated in the MSA Account and is available to withdraw from that account at PTIC's discretion.

44.     PTIC maintains a reserve account with Enterprise Bank & Trust ("**Enterprise**").

45.     PTIC maintains a checking account with BB&T (the "**BB&T Checking Account**").  The BB&T Checking Account serves as PTIC's local operating account in North Carolina and assists the Debtors in the operation of their enterprise in North Carolina.

46.     USA Tobacco maintains a checking account with Chase (the "**USAT Chase Account**").  The proceeds from the sale of tobacco in most states are deposited into the USAT Chase Account and the funds in the USAT Chase Account are swept on a daily basis to the Concentration Account.  The Concentration Account transfers funds to the USAT Chase Account to fund any expenditures of the USA Tobacco and for the payment of certain state taxes.  The Debtors account for the transfers between the Concentration Account and the USAT Chase Account.

47.     Century Brands maintains a checking account with Chase (the "**Century Concentration Account**") and a deposit account with Chase (the "**Century Reserve Account**").  The Century Concentration Account serves as Century Brands' operating account.  PTIC makes intercompany loans to Century Brands by transferring funds from the Concentration Account to the Century Concentration Account.  Receipts from sales made through the internet are deposited

-15-

into the Century Reserve Account and those funds are swept on a daily basis to the Century Concentration Account.

48.     The Debtors further request authority to deposit funds in and withdraw funds from all such accounts postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, ACH, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

49.     In the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon.   In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, along with the Debtors' checks, the "**Business Forms**").   To minimize administrative expense and delay, the Debtors request authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

50.     The Debtors maintain business relationships with each other that give rise to intercompany claims (the "**Intercompany Transactions**").   The Debtors maintain records of its Intercompany Transactions, including fund transfers, and thus can ascertain, trace and account for Intercompany Transactions.   The Debtors reconcile all Intercompany Transactions on a monthly basis.   The Debtors will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition.

51.     The entry of an order authorizing the relief sought in this motion is critical to the Debtors' ability to seamlessly operate in the chapter 11 process.

-16-

PHX 331025046v9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

**D. Debtors' Emergency Motion for Interim Order and Final Orders (A) Authorizing the Debtor to Pay Prepetition Wages to Their Employees, Continue to Take Appropriate Employee Deductions, and Maintain their Employee Benefits and Programs in Accordance with the Debtors' Ordinary Course of Business and (B) Authorizing and Directing the Applicable Banks and Other Financial Institutions to Receive Process, Honor and Pay All Checks Presented for Payment and to Honor all Electronic Payment Requests Made by the Debtor Related to the Foregoing**

52.     In order to enable the Debtors to maintain morale during this critical time, retain their current Employees and minimize the personal hardship such Employees, may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtors seek authority, in their discretion, to pay and honor, as the case may be, (a) authorizing the debtors to pay prepetition: (i) wages, salaries, and other compensation to their employees, (ii) withholdings and deductions and (iii) reimbursement of employee expense; (b) authorizing the debtor to continue to provide employee benefits in the ordinary course of business and take appropriate employee deductions, and (c) authorizing and directing the applicable banks and other financial institutions to receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests made by the debtors related to the foregoing; and (c) granting such other and further relief as is just and proper under the circumstances.

### 1.     *Employees*

53.     All employees are paid hourly wages or salary (collectively, the "**Wages**").  The Debtors have a total of seventy-three (73) employees; all of which are full time employees (defined as thirty-two (32) or more hours per week).  The Debtors do not currently employ any part time employees.   Forty-seven (47) employees are salaried employees (the "**Salaried Employees**") and twenty-six (26) employees are paid hourly (the "**Hourly Employees**" and together with the Salaried Employees, the "**Employees**").  In addition, approximately twenty-five

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331025046v9

(25) of the Salaried Employees are eligible to receive commissions and/or quarterly bonuses as additional compensation if certain defined metrics are satisfied.

54. The Debtors utilize the services of approximately four contracting firms/temporary agencies to provide temporary labor to supplement the services provided by the Employees. The Debtors also utilize the services of J Marketizing, LLC, to facilitate the sale of certain products (the "**Broker**"). The Debtors pay the Broker a commission related to a percentage of the sales generated by the Broker ("**Broker Fees**").

55. All Salaried Employees are paid on the last Friday before the 15th day and the last business day of each month. All Hourly Employees are paid on a fortnightly basis on Thursdays for the hours worked during the two week period ending the previous Saturday. To provide for the payment of Wages, PTIC transfers funds to ADP (as defined below) one day before a pay date. Certain salaried Employees entitled to monthly commissions receive their commission payments on the first payroll of the following month. All quarterly bonuses are paid on the first payroll date following the end of the previous quarter. ADP performs all federal, state and payroll tax withholdings related to the Wages.

56. No employee is owed in excess of $12,425.

57. As a result of the commencement of these cases certain Wages, Broker Fees and certain amounts owed to Independent Contractors accrued prior to the Petition Date (collectively, the "**Prepetition Wages**"). The Debtors believe that the costs associated with paying Prepetition Wages are relatively minimal compared with the damage to the Debtors' estates that would follow if employee morale were harmed by the Debtors' failure to pay Prepetition Wages.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## 2. *Wages, Salaries and Payroll Obligations*

58.     All Salaried Employees are paid on the last Friday before the 15th day and the last business day of each month.  All Hourly Employees are paid on a fortnightly basis on Thursdays for the hours worked during the two week period ending the previous Saturday.

59.     The Debtors' last regular payroll dates were as follows: Hourly Payroll – pay period of February 23, 2014 – March 8, 2014, with a pay date of March 13th, 2014; Salary Payroll – pay period of March 1, 2014 -March 15, 2014 with a pay date of March 14, 2014.   The Debtors estimate that, as of the Petition Date, approximately $16,000 in Wages and Salaries has accrued and is owed to their Employees, with no Employees owed in excess of $12,425.

60.     Automatic Data Processing, Inc. ("**ADP**") processes payments for both hourly and salary payrolls  for the Debtors.  The Debtors pay ADP a total of approximately $3,000 per month for payroll administration and certain other payroll related services.  The Debtors estimate that there is approximately $1,800 in accrued and unpaid costs in connection with ADP.  The Debtors request the authority to continue pay the approximately $3,000 monthly fee in the ordinary course of business, and up to $1,800 in accrued and unpaid payroll processing related fees.

61.     The Debtors, as employers, are required by law to withhold federal, state and local taxes from Wages and Salaries for remittance to appropriate tax authorities (the "**Employee Taxes**").  In addition, the Debtors are required to pay, from their own funds, the social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "**Payroll Taxes**") and remit the same to the appropriate authorities (collectively, the "**Taxing Authorities**").  For Employees, the Debtors pay Payroll Taxes to various Taxing Authorities in accordance with the Internal Revenue Code and applicable state

law.  The Debtors seek authority to honor and process the prepetition obligations with respect to the Payroll Taxes.

### 3.    *Vacation Time and Sick/Personal Days*

62.    In addition to Prepetition Wages, and other employee benefits, the Debtors are seeking authorization to honor their employees' and insiders' accrued vacation, sick time and other leave in the ordinary course of business (collectively, "**Paid Time Off**") whenever such Paid Time Off was earned and accrued.  Thus, the Debtors seek authorization to honor Paid Time Off which was earned and accrued more than 180 days in advance of the Petition Date.

63.    Employees who have been employed by the Debtors for more than one full year of employment are eligible to take vacation time off with pay, based on their individual accrued vacation schedules.  Vacation time accrual is based on length of service with the Debtors.  The Debtors' obligation to the Employees on account of accrued but unused vacation time is approximately $85,000.  The Debtors do not allow individuals to "cash-out" any accrued vacation time during their employment; instead, the Debtors only cash out any accrued vacation time upon the termination (either voluntary or involuntary) of employment with the Debtors.

64.    Salaried Employees who have been employed by the Debtors for more than ninety (90) days are eligible to take time off from work for sickness with pay.  Salaried Employees are not paid for accrued and unused sick time at termination of employment.  Sick time will continue to accrue during paid vacation and sick time off.

65.    In the event an employee is terminated, the Debtors seek authorization to pay such employee Paid Time Off, as and to the extent required by law, but only to the extent of the $12,425 cap on priority wages and compensation as limited by section 507(a)(4) of the

-20-

PHX 331025046v9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Bankruptcy Code. The Debtors do not believe that any of its employees has accrued Paid Time Off that would total in excess of the $12,425 cap on priority wages.

### 4. *Employee Benefit Plans*

66. The Debtors offer various benefit plans to its full time employees, including medical insurance, dental insurance, life and accidental death and dismemberment insurance, short-term disability, long-term disability, COBRA insurance, a 401(k) retirement savings plan and a car allowance (collectively, and as described herein and in the motion, the "**Employee Benefits and Programs**"). Some of the Employee Benefit Plans are fully funded by the Employees, and others are funded either partially or fully through contributions made by the Debtors.

### a. *Medical/Dental/Vision Plans*

67. Under the Employee Benefits and Programs, eligible employees may participate in the Debtors' health insurance plan and, in connection therewith, purchase certain optional benefits. The Debtors pay for a portion of the cost of each participating employee's medical insurance (the "**Company Contribution**").

68. A participating employee is responsible for any cost of health insurance that exceeds the Company Contribution, as well as for the cost of any optional benefits which he/she purchases. The Employee Benefits and Programs qualify under Section 125 of the Internal Revenue Code such that the portion of the cost for which the employee is responsible will be deducted from his/her pay on a pre-tax basis before determining the employee's FICA, Medicare and income tax withholdings. The cost of optional benefits for which the employee is responsible is also deducted from the participating employee's paycheck on a pre-tax basis.

-21-

69.     The Debtors offer health insurance coverage to their Employees.  The Debtors offer two plans (1) PPO $5000 Base Plan and (the "**Base Plan**") (2) PPO $4000 Buy-Up Plan (the "**Buy-Up Plan**" and together, the "**Medical Plans**").  Approximately forty nine (49) Employees are enrolled in the Medical Plans.  The monthly premiums for medical insurance paid by the Debtors (which are partially offset by employee contributions made through Employee Deductions) are approximately $15,100 (the "**Employer Medical Contributions**").  Thus, the Debtors request authorization to (i) continue the Medical Plans, (ii) to pay the Employee Medical Contributions, and (iii) to continue to pay Employer Medical Contributions.

70.     The Debtors provide dental insurance to Employees through Lincoln Financial Group (the "**Dental Plan**").  The monthly premiums for dental insurance paid by the Debtors (which are partially offset by employee contributions made through Employee Deductions) are approximately $1,550.  The Debtors withhold the portion of the dental premium paid by an Employee from their paycheck and remit payment to Lincoln Financial Group.  The Debtors request authorization to continue the Dental Plan and to pay any portion of the employer contributions to the Dental Plan that accrued prepetition.

71.     The Debtors automatically provide eligible Employees with $15,000 of Basic Life and Accidental Death & Dismemberment insurance the cost of which (approximately $3.73/month) is borne entirely by the Debtors.  The Debtors also provide voluntary short-term disability and voluntary long-term disability insurance policies to their Employees.  The voluntary short-term disability and voluntary long-term disability insurance policies are paid by for entirely by the Employees who elect such coverage.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-22-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

72.     In addition, the Debtors offer eligible Employees supplemental life insurance through Lincoln Financial.  Employees who to purchase supplemental life insurance bear 100% of the cost of the premiums.

### b.     *Workers Compensation Insurance*

73.     The Debtors maintain workers' compensation insurance as required by the laws in the various states in which the Debtors have employees.  The Debtors' workers' compensation program provides benefits to employees for claims arising from or related to their employment with the Debtors.

74.     The Debtors maintain workers' compensation coverage, in accordance with state law, through The Harford Company (the "**Hartford Policy**").  Under the Hartford  Policy, the Debtors pay a fixed annual premium which has the effect of transferring 100% of risk to The Hartford Company.  The monthly premium paid on account of the Hartford Policy is approximately $4,750 and, after the Debtors make payment, reconciliation, allocation, and accounting adjustments follow.

75.     The Debtors do not believe that any amounts are owing to The Hartford Company as of the Petition Date.  In order to remain in compliance with state law, the Debtors respectfully request the Court's authorization to continue to make payments to The Hartford Company and to make any payment owed on account of prepetition amounts owing, in an amount not to exceed $4,750 and to continue to pay such obligations in the course of business as they come due after the Petition Date.

### c.     *401(k) Retirement Savings Plan*

76.     The Debtors offer and maintain a 401(k) retirement savings plan (the "**401(k) Plan**") to provide participating employees with retirement benefits.  Eligible employees may

PHX 331025046v9

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1  contribute a portion of their pre-tax compensation to the 401(k) Plan through payroll

2  withholdings.

3        77.    In addition, on a discretionary basis, the Debtors may make contributions to the

4  401(k) Plan on behalf of the participants; however, the Debtors do not currently match any

5  employee contributions to the 401(k) Plan.    Employees are always 100% vested in their

6  contributions to the 401(k) Plan, as well as in any matching contributions made by the Debtors.

7  Eligibility is limited to full time employees who work at least thirty-two (32) hours per week,

8  have attained the minimum age of twenty-one (21) years and have been employed by the Debtors

9  for the past ninety (90) days.  As of the Petition Date, twenty nine (29) Employees participate in

10  the 401(k) Plan.

11        78.    Through the 401(k) Plan, participants invest their funds in various mutual funds

12  managed by CPI Qualified Plan Consultants ("**CPI**").   CPI is the third-party administrator for the

13  401(k) Plan and is paid by charging the Debtors (1) a base rate, (2) a base fee per participant,

14  (3) charges for other administrative functions, i.e., distributions and rollovers.  Fees paid to CPI

15  average approximately $300 per month over the last twelve months.

16           **d.**    *Car Allowance*

17        79.    The Debtors provide certain employees an automobile allowance to allow those

18  employees to operate a vehicle and to facilitate those employee's work related tasks (the "**Car**

19  **Allowance**").  As of the Petition Date, John Wertheim, the Chief Financial Officer and Chairman

20  of the Board of Directors and James Emery, the Chief Executive Officer and a shareholder of

21  PTIC receive a Car Allowance.  The Debtors estimate that as of the Petition Date, the accrued and

22  unpaid expenses related to the Car Allowance will not exceed $1,200.

-24-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

e.    *Expense Reimbursement*

80.    Certain of the Debtors' employees use their personal credit cards and expend cash for business expenses, including, but not limited to, work-related travel and office supplies. This rarely occurs and typically only when a merchant does not accept American Express.

81.    Employees are encouraged to submit expense reports in a timely manner, however, the Debtors believe that there are employees who have used their personal funds prepetition for business expenses but have yet to submit expense reports. These employees have a reasonable expectation of being reimbursed for these expenses (the "**Expense Reimbursement**").

82.    On a monthly basis, the average Expense Reimbursement obligations are approximately $6,900.

83.    In addition, certain of the Debtors' employees who use personal vehicles for company business are reimbursed for the use of their vehicles. The Debtors utilize the services of CRS, Inc. ("**CRS**"), a third party to track and compensate individuals for the use of their vehicles. The Debtors' pay CRS a small fee in exchange for these services. As a result of the commencement of these chapter 11 cases, the Debtors estimate that they owe CRS approximately $12,000, which represents amounts to be paid to the Debtors' Employees to compensate such Employees for the use of their personal vehicles.

**E.    Motion of the Debtors for Entry of an Order Authorizing, But Not Directing, the Debtors to Honor Certain Prepetition Obligations to Customers and Marketing Affiliates, and to Otherwise Continue Certain Prepetition Incentive Practices and Programs in the Ordinary Course of Business**

84.    The Debtors maintain a variety of customer-related programs that provide direct benefits to the Debtors' customers and promote customer loyalty, including without limitation, rebates, guarantees, rewards, contests and refunds (collectively, the "**Customer Programs**").

-25-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

85.     The success and viability of the Debtors' businesses and the Debtors' ability to successfully maximize value for the stakeholders in these Chapter 11 Cases are dependent in large part upon the loyalty of their existing customers.  The Customer Programs are fundamental to the continued success of the Debtors' businesses because, by design, the Customer Programs encourage new and repeat business and ensure customer satisfaction, thereby retaining current customers, attracting new customers and ultimately increasing the Debtors' revenue.  Maintaining the Customer Programs is critical to both obtaining new customers and the continuation of customer loyalty and satisfaction, and failure to continue these programs would severely and irreparably impair the Debtors' customer relations.  Absent the Customer Programs, the Debtors' ability to generate revenue would be negatively impacted.  Indeed, if the Debtors are unable to continue the Customer Programs without interruption, they will be at a significant disadvantage compared to their competitors.   Therefore, the ability to continue to provide the Customer Programs is vital to the Debtors' ability to emerge from chapter 11 protection with a strong market share and customer base.

86.     Prior to the Petition Date, in the ordinary course of their businesses and as is customary in the industries in which the Debtors operate, the Debtors implemented certain Customer Programs, including but not limited to the Rebates Program, the Pre-Payment Discounts, Product Discounts and Loyalty Programs.

87.     The Debtors maintain a promotional rebate program for qualifying distributors (the "**Rebates Program**").  Pursuant to the Rebates Program, a qualifying distributor is entitled to a rebate on a quarterly basis.  The amount of the rebate is dependent upon the gross revenue purchases made by a qualifying distributor per quarter.

-26-

PHX 331025046v9

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

88. As of the Petition Date, the Debtors estimate approximately $65,000 is accrued and unpaid pursuant to the Rebates Program.

89. The Debtors provide a discount to qualifying customers for early payment or pre-payment (the "**Pre-Payment Program**"). Pursuant to the Pre-Payment Program certain customers are entitled to a discount if the customer either prepays for a shipment or provides prompt payment for goods.

90. As of the Petition Date, the Debtors estimate approximately $70,000 is accrued and unpaid pursuant to the Pre-Payment Program.

91. The Debtors provide certain discounts to large-volume distributors as well as to smaller distributors pursuant to a pre-approved discount for initial orders or certain suggested retail price concessions (the "**Product Discount Program**"). Pursuant to the Product Discount Program certain large-volume distributors are entitled to purchase the Debtors' products at discounted rates. Additionally, other distributors are entitled to certain discounts related to certain suggested retail price concessions. Additionally, the Debtors also offer certain discounts to distributors related to new products in order to incentivize additional sales. The Debtors also offer certain discounts to distributors to allow the Debtors to control retail and consumer pricing of their products.

92. As of the Petition Date, the Debtors estimate approximately $20,000 is accrued and unpaid pursuant to the Product Discount Program.

93. The Debtors provide a discount to qualifying customers that promote and maintain a loyalty or rewards program (the "**Loyalty Program**"). Pursuant to the Loyalty Program certain customers who maintain loyalty or reward programs are entitled to a discount to facilitate the execution of the loyalty or reward programs.

-27-

PHX 331025046v9

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

94.     As of the Petition Date, the Debtors estimate approximately $66,000 is accrued and unpaid pursuant to the Loyalty Program.

95.     The Debtors receive payments from customers which consist of short pay amounts, including but not limited to the following: (i) product was refused due to shipping damage or picking errors, (ii) product was short of quantity ordered, (iii) return of outdated or unsalable product, (iv) reclamation or destruction of unsalable product and (v) other miscellaneous reasons.  At times, customers may have a credit balance against the Debtors for returned product for which the customer has previously paid for in full.  The industry standard is for tobacco companies to provide 100% product guarantee for product.  When product is returned to the Debtors and accounted for, the Debtors' issue a credit memo to be applied to future purchases by the purchaser (the "**Credit Reconciliation Program**").    Pursuant to the Credit Reconciliation Program, certain customers may be entitled to use their credit to offset future purposes.

96.     As of the Petition Date, the Debtors estimate approximately $100,000 is accrued and unpaid pursuant to the Credit Reconciliation Program.

97.     If the Debtors fail to seamlessly provide accrued benefits earned pursuant to the Customer Programs the Debtors' businesses may suffer irreparable harm.  It is therefore vital to the Debtors' continued business operations and Customer Programs that the Debtors be permitted to continue the Customer Programs.

-28-

*PHX 331025046v9*

F. **Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate <u>Assurance of Payment</u>**

98.     In connection with the operation of their businesses and management of their estates, the Debtors obtain electricity, gas, waste management, internet, telecom, alarm and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**").

99.     In the ordinary course of business, the Debtors regularly incur utility expenses for Utility Services provided by various Utility Providers. The Debtors have a long and established payment history with most or all of the Utility Providers. The Debtors' aggregate average monthly cost for utility services is approximately $30,000.

100.     Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these Chapter 11 Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed. Specifically, lack of electricity and phone service would render the Debtors' burglar and fire alarm systems, which are necessary to maintain insurance coverage, inoperable. In addition, the lack of electricity would cause a sudden halt in the Debtors' production and would significantly jeopardize the Debtors' ability to continue marketing and distributing its products. It is therefore critical that utility services continue uninterrupted.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331025046v9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

**G.**     **Debtors' Emergency Motion for Entry Order (A) Authorizing the Debtors to Pay Prepetition Sales, Use, and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and (B) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

101.     In connection with the normal operation of their business, the Debtors pay an assortment of excise, sale, use, franchise and similar taxes (collectively, the **"Taxes"**) to various federal, state, and local taxing authorities (collectively, the **"Taxing Authorities"**) and pay various regulatory fees (**"Regulatory Fees"**) and import fees, including customs and duty taxes (the **"Import Fees"**, and together with the Regulatory Fees and Taxes, the **"Taxes and Fees"**) to certain federal, state, and local regulatory authorities (collectively, the **"Regulatory Authorities,"** and together with the Taxing Authorities, the **"Taxing and Regulatory Authorities"**), including, but not limited to, those Taxing and Regulatory Authorities listed on **Exhibit A** of the motion.[6]  These Taxes and Fees include, without limitation, the following: Excise, Sales, Use and Franchise Taxes and Regulatory and Import Fees.

102.     In the normal course of their business, the Debtors incur excise taxes (the **"Excise Taxes"**) upon the sale of their products.  The Debtors collect and remit or otherwise pay Excise Taxes as needed to the applicable Taxing Authorities.  In addition to the Excise Taxes owed but not yet paid as of the Petition Date, the Excise Taxes may also include amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, though the Debtors are not aware of any such checks.  The Debtors pay the Excise Taxes by either purchasing excise tax stamps which are then affixed to their products or on a periodic basis

---

[6] Inclusion of a Taxing or Regulatory Authority on **Exhibit A** does not constitute an acknowledgement by the Debtors that the Debtors owe any obligation to such authority or that such authority will be paid pursuant to any order entered on this Motion.

*PHX 331025046v9*

by tax return to both the Internal Revenue Service and the taxing authorities of each state where the Debtors' products are sold.

103.     In addition, in the normal course of their business, the Debtors incur use taxes (the **"Use Taxes"**) on account of the purchase of various machinery and equipment or other goods used in the Debtors' business.  The Use Taxes typically arise pursuant to purchases the Debtors make from out-of-state vendors that do not collect state sales tax on such out-of-state purchases.  The Use Taxes are typically equivalent to the amount of sales tax that would have been charged on the purchase of such goods if the purchase had occurred within the state where the vendor is located.

104.     In addition, the Debtors incur certain franchise taxes (the "**Franchise Taxes**") in states where the Debtors conduct their operations.   The Debtors estimate that they owe approximately $350,000 in accrued and unpaid Excise Taxes, Use Taxes and Franchise Taxes as of the Petition Date.

105.     The Debtors incur certain Regulatory Fees consisting of amounts owed to federal, state and local governments, which require the Debtors to obtain certain licenses and to pay corresponding license and permit fees.  The requirements for a company to obtain a business license and the manner that the Regulatory Fees are computed vary greatly according to the various federal, state and local government laws and regulations.  The Debtors do not believe that any amounts in respect of the Regulatory Fees have accrued but remain unpaid as of the Petition Date.

106.     In addition, the Debtors incur Import Fees, certain tax-related import duties, port fees, or other similar shipping and docking fees, generally pursuant to the Debtors' purchase of foreign goods used to manufacture the Debtors' products.  Typically, payments in respect of such

PHX 331025046v9

-31-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Import Fees are paid by the freight service company utilized by the Debtors, which then bills the Debtors for these amounts. Accordingly, it is difficult for the Debtors to determine the exact amount outstanding in respect of such Import Fees separate from any amounts they owe to the freight service company. The Debtors do not believe that any amounts in respect of accrued and unpaid Import Fees as of the Petition Date.

**H.** **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Shipping Charges in the Ordinary Course of Business**

107.  The Debtors are engaged in the distribution of tobacco products and food supplements, including energy products. As part of their business operations, the Debtors rely on a variety of service providers, common carriers, shippers and/or truckers, including All World International Shipping, Inc. ("**AWIS**"), Cox Transportation Services ("**Cox**"), DHL Express USA ("**DHL**"), Estes Forwarding Worldwide ("**Estes**"), FedEx Corporation ("**FedEx**"), SAIA Motor Freight Line, LLC ("**SAIA**"), Tazmanian Freight Systems, Inc. ("**Tazmanian**"), and United Parcel Service of America, Inc. ("**UPS**," and, together with AWIS, Cox, DHL, Estes, FedEx, SAIA, and Tazmanian, the "**Shippers**"). The Debtors' business depends upon the regular shipping of materials products. The Debtors' tobacco products and food supplements are shipped to wholesale distributers across the globe. It is essential to the Debtors' business that the Debtors' system of shipping and delivery continue without interruption.

108.  The services provided by the Shippers, including the timely, reliable delivery of goods to the Debtors' customers, are an absolute necessity to the Debtors' ability to conduct business. The Debtors have a reputation for reliability and dependability among their customers. Many of the Debtors' pricing policies and marketing strategies revolve around their reliability and dependability. This reputation depends in substantial part on the timely delivery of product to the

-32-

Debtors' customers. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for receipt of the products that the Debtors sell. This supply and delivery system involves the use of reputable service providers.

109. It is essential for the Debtors' continuing business viability, as well as to the value of their estates, that they receive certain critical services and maintain a reliable and efficient distribution system. Because the Debtors are dependent on third parties to carry out various distribution functions, it is essential that the filing of these Chapter 11 Cases not provide an excuse for any third party to cease performing timely services. The Debtors' continuing business viability, and the Debtors' efforts to maximize value for creditors depends on the Debtors' ability to receive certain critical services and to maintain a reliable and efficient distribution system. For example, if the Debtors cannot produce and ship products and displays for timely receipt to its customers, the Debtors will lose valuable shelf space for their product in stores the Debtors market share will be severely impacted, thereby causing irreparable damage to their businesses. At the very least, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' businesses.

110. The Debtors have negotiated attractive rates with each of the Shippers, which allow the Debtors to remain completive in pricing their products. The Debtors do not believe that they would be able to obtain such attractive replacement rates with other companies in a timely manner in the event that the Shippers refuse to continue servicing the Debtors' needs. Because the Debtors' businesses depend upon the uninterrupted and timely delivery of their products, it is essential that the Debtors be permitted to continue working with the current slate of Shippers without disruption.

PHX 331025046v9

-33-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

111.　By this motion, the Debtors seek to prevent the breakdown of their distribution operations, including, but not limited to, their shipping network.　They request authority to pay certain prepetition claims and satisfy certain potential liens and shipping charges, as, in their business judgment, the Debtors determine, subject to the requirements imposed on the Debtors under any order regarding the Debtors' use of cash collateral, is necessary or appropriate to (a) obtain the release of critical or valuable goods detained in transit pending payment, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce critical service providers to continue to provide services and the Shippers and Warehouses to continue to carry goods and make timely delivery.

**I.**　**Motion of the Debtors for Entry of Interim and Final Orders Authorizing Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums and Brokers' Fees Arising Thereunder, and Renew or Enter into New Policies, (B) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Premium Financing Arrangements and (C) Granting Such Other and Further Relief as is Just and Proper Under the Circumstances**

112.　In the ordinary course of the Debtors' businesses, the Debtors maintain numerous insurance policies providing coverage for, *inter alia,* commercial general liability, legal liability, umbrella liability, automobiles, shipping, property, excess property, foreign liability and workers compensation (collectively, the "**Policies**").　These Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in many cases, such insurance coverage is required by various regulations, laws, and contracts that govern the Debtors' business conduct.

113.　The Policies are essential to the Debtors' businesses, and the Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under their current insurance contracts (including related brokers' fees).　Any other alternative would likely

-34-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates.

114.    The Debtors have determined in their business judgment that it is not economically advantageous for the Debtors to pay the premiums for all of their Policies on an annualized basis. Accordingly, in the ordinary course of the Debtors' businesses, the Debtors finance the Policies' premiums pursuant to a premium financing agreement (a "**PFA**") with First Insurance Funding Corporation ("**First Insurance**") a third-party lender.  A copy of the current PFA for the affected Policies is attached to the motion as **Exhibit B** (the "**First Insurance PFA**").

115.    The First Insurance PFA presently requires cumulative monthly installment payments of $46,948 due on the first day of each month beginning on August 1, 2013, and continuing for a period of ten (10) months ending May 1, 2014.  The First Insurance PFA bears a total finance charge of $7,559 on the total financed amount of $462,507.  The annual interest rate under the First Insurance PFA is 3.550%.  The terms of the First Insurance PFA provide that the Debtors pay First Insurance monthly installments in exchange for First Insurance's agreement to pay the full annual insurance premium, in advance, to the Debtors' various insurance providers.

116.    Pursuant to the First Insurance PFA, the Debtors' obligation to First Insurance will be collateralized by a security interest in all insurance policies financed through the First Insurance PFA.

117.    Upon renewal of their Policies on July 1, 2014 the Debtors propose to enter into new PFAs and make monthly premium payments due thereunder and grant liens and security interests thereunder.

118.    Although the Debtors are not presently aware of any such premium obligations or the necessity of such payment, the Debtors seek this authority out of an abundance of caution, in

-35-

recognition of the critical necessity of keeping their insurance policies in effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies.

**J.**   **Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 521, Bankruptcy Rule 1007 and Local Rule 1007 Extending Time to File Schedules and Statements of Financial Affairs**

119.    The Debtors have already begun and will continue to work diligently to compile the information necessary to complete the Schedules.  Specifically, the Debtors must gather information from various documents, sources, and locations and complete the posting of their books and records as of the Petition Date or other dates, as appropriate.  Then the Debtors must review that information and prepare and verify the Schedules.  However, given the critical matters with which the Debtors have been and is currently dealing, the Debtors do not believe that they will have sufficient time to complete preparation of the Schedules within the required timeframe.

120.    Additionally, upon reasonable request, the Debtors will provide parties-in-interest with material information concerning their business and financial affairs, including information that will be contained in the Schedules, as such information becomes available.

**K.**   **Chapter 11 and Ordinary Course Professionals**

121.    The Debtors have filed, or will soon file, and are seeking entry of orders authorizing them to employ and retain various professionals to assist them in the conduct of these cases, including:

(a)    Greenberg Traurig, LLP as counsel for the Debtors;

(b)    Odyssey Capital Group, LLC as Financial Advisors to the Debtors;

PHX 331025046v9

-36-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

(c)     Schian Walker, P.L.C., as conflicts counsel.

122.    The Debtors also customarily retain the services of various attorneys, accountants, consultants, and other professionals and experts to assist them in matters arising in the ordinary course of their business unrelated to these Chapter 11 Cases (each an "**Ordinary Course Professional**", and collectively, the "**Ordinary Course Professionals**").

123.    The Ordinary Course Professionals will not be involved in the administration of these Chapter 11 Cases, but rather will provide services in connection with the Debtors' ongoing business operations or services.

124.    The Debtors have filed (or will soon file) an application for an administrative order establishing procedures for the interim and monthly compensation and reimbursement of expenses of professionals.  I believe that the retention of the professionals listed above is necessary under the circumstances of these Chapter 11 Cases.  Indeed, with the filing of these chapter 11 cases, the Debtors and their professionals will turn their attention to various issues requiring their professional expertise that are expected to arise as a result of the filing of these Chapter 11 Cases.

**IV.**
**CONCLUSION**

125.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

[Signature on next page]

PHX 331025046v9

-37-

Dated: March 15, 2014                    DECLARANT

_____
John T. Wertheim

PHX 331025046v7

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000