1  GREENBERG TRAURIG, LLP
   David D. Cleary, AZ SBN 011826
2  clearyd@gtlaw.com
   2375 East Camelback Road, Suite 700
3  Phoenix, Arizona 85016
   Telephone: 602-445-8000
4  Facsimile: 602-445-8100

5  *Attorney for Debtors and Debtors-in-Possession*

6

7              IN THE UNITED STATES BANKRUPTCY COURT

8                  FOR THE DISTRICT OF ARIZONA

9  In re:                                    Case No. 2:14-bk-03518 (MCW)
   Prime Time International Company, an      Chapter 11
10 Arizona corporation, *et al.,*            (Jointly Administered)

11         Debtors and Debtors-in-Possession.
                                             **DEBTORS' MOTION FOR ENTRY OF**
12 _____       **ORDERS: (A)(I) APPROVING BID**
                                             **PROCEDURES RELATING TO SALE OF**
   This filing applies to:                   **THE DEBTORS' ASSETS; (II) APPROVING**
13                                           **BID PROTECTIONS; (III) SCHEDULING A**
   ☒   All Debtors                          **HEARING TO CONSIDER THE SALE; (IV)**
14 ☐   Specified Debtors                     **APPROVING THE FORM AND MANNER**
                                             **OF NOTICE OF SALE BY AUCTION; (V)**
15                                           **ESTABLISHING PROCEDURES FOR**
                                             **NOTICING AND DETERMINING CURE**
16                                           **AMOUNTS; AND (VI) GRANTING**
                                             **RELATED RELIEF; AND (B)(I)**
17                                           **APPROVING ASSET PURCHASE**
                                             **AGREEMENT AND AUTHORIZING THE**
18                                           **SALE OF CERTAIN ASSETS OF DEBTORS**
                                             **OUTSIDE THE ORDINARY COURSE OF**
19                                           **BUSINESS; (II) AUTHORIZING THE SALE**
                                             **OF ASSETS FREE AND CLEAR OF ALL**
20                                           **LIENS, CLAIMS, ENCUMBRANCES AND**
                                             **INTERESTS; (III) AUTHORIZING THE**
21                                           **ASSUMPTION, SALE AND ASSIGNMENT**
                                             **OF CERTAIN EXECUTORY CONTRACTS**
22                                           **AND UNEXPIRED LEASES; AND (IV)**
                                             **GRANTING RELATED RELIEF**
23

24

25                                           Hearing Date:  Not Yet Set
                                             Hearing Time:  Not Yet Set
26 _____

HX 331237015v5

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby move the Court (the "**Motion**"), pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 1015, 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 and 6006-1 of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Arizona (the "**Local Rules**"), for entry of two orders: (a) one, substantially in the form annexed hereto as **<u>Exhibit A</u>** (the "**Bid Procedures Order**"), (i) approving the procedures (the "**Bid Procedures**") substantially in the form annexed to the Bid Procedures Order; (ii) approving the bid protections as set forth in the asset purchase agreement (the "**Purchase Agreement**") annexed to the Bid Procedures between the Debtors and Prime Time International Acquisition, LLC (the "**Stalking Horse**"); (iii) scheduling a hearing (the "**Sale Hearing**") on the proposed sale of substantially all of the Debtors' assets or equity (the "**Sale**") and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice (the "**Sale Notice**") of an auction for the Assets (as defined herein) (the "**Auction**"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "**Assigned Contracts**"); and (v) granting related relief; and (b) a second order, substantially in the form annexed hereto as **<u>Exhibit B</u>** (the "**Sale Order**"), (i) authorizing and approving the Purchase Agreement, substantially in the form attached hereto as **<u>Exhibit G</u>**; (ii) authorizing the sale free and clear of liens, claims, encumbrances, and interests; (iii) authorizing the assumption and assignment of the Assigned Contracts, and (iv) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## I. <u>Jurisdiction</u>

1.     The United States Bankruptcy Court for the District of Arizona (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

district pursuant to 28 U.S.C. § 1408.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought herein are sections 105(a), 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 1015, 2002, 6004, 6006, and 9007, and Local Rules 6004-1 and 6006-1.

## II.     Background

### A.     General Background

3.     On March 15, 2014 (the "**Petition Date**"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court (collectively, the "**Chapter 11 Cases**").  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     Since shortly after the Petition Date, the Debtors engaged its professionals to begin developing the framework of a plan of reorganization, including a market exploration process which will serve as a foundation for the Debtors' exit from these Chapter 11 Cases.  The Debtors and their professionals have involved and informed its secured lender of the steps undertaken to develop the market exploration process and continue to work with them.

5.     Currently, the Exclusive Filing Period under section 1121(c)(2) is set to expire on September 26, 2014.  The Exclusive Solicitation Period under section 1121(c)(3) during which only the Debtors' Plan may be considered for acceptance or rejection is set to expire on November 25, 2014.  The Debtors have filed a motion seeking an extension of these deadlines in order to complete the market exploration process [Docket No. 227].

### B.     The Debtors' Operations.

6.     Prime Time International Company, Inc. (**"PTIC"** or **"the Company"** or **"the Debtor"**) was incorporated in 1993 under the laws of the State of Arizona for the purpose of manufacturing and distributing a wide variety of cigarettes and little cigars.  PTIC has two

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331237015v5

-3-

Case 2:14-bk-03518-MCW    Doc 267    Filed 09/30/14    Entered 09/30/14 12:51:54    Desc
Main Document    Page 3 of 37

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

wholly-owned subsidiaries: USA Tobacco Distributing, Inc. (**"USA"**) and 21st Century Brands, LLC (**"21st"**) (collectively, with PTIC, **"the Debtors"**). USA was incorporated in Arizona in 1993 for the purpose of distributing PTIC's products. 21st was organized in Arizona in 2009 for the purpose of marketing and distributing non-tobacco consumer products. PTIC's customers are located primarily in North America.

7. In addition to normal course costs of operations, market development and product enhancements, the Debtors have long term debt pursuant to certain loans made to the Debtors by JPMorgan Chase Bank, N.A. (**"Chase"** or the **"Prepetition Lender"**). That debt is comprised of: (i) a loan made by Chase to the Debtors in the original principal amount of $3,500,000 (the "**Facility A Loan**") which is evidenced by, among other things, (x) that certain Credit Agreement by and between PTIC and Chase dated May 13, 2011 (the "**Credit Agreement**") and (y) that certain Promissory Note by PTIC in favor of Chase dated May 13, 2011; (ii) a loan made by Chase to the Debtors in the original principal amount of $1,140,912.50 (the "**Facility B Loan**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated February 2, 2009; (iii) a loan by Chase to the Debtors in the original principal amount of $2,200,000.16 (the "**Facility C Loan**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated October 7, 2011 and (iv) a loan made by Chase to PTIC in the original principal amount of $100,000 (the "**Equipment Loan**, and together with the Facility A Loan, the Facility B Loan and the Facility C Loan, the "**Loans**") which is evidenced by, among other things, (x) the Credit Agreement and (y) that certain Promissory Note by PTIC in favor of Chase dated November 28, 2011.

8. As of the Petition Date, the Debtors were indebted to the Prepetition Lender in principal amount of not less than $3,492,479.94 as a result of the Loans. Since the Petition Date, the Debtors have made payment to the Prepetition Lender as additional adequate protection

PHX 331237015v5

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    payments in an amount of $345,925.74, comprised of $201,364.66 of principal reduction and

2    $144,561.08 of interest. As of September 30, 2014, the amount outstanding to the Prepetition

3    Lender is $3,291,115.28.

4          9.      The Company is a successful business operation with over $37 million in sales last

5    year. It employs over seventy-three (73) people. The Company believes the business has

6    significantly more value as a going concern than if it were to liquidate its business and assets.

7    Having engaged its professionals to pursue the market exploration process, and working with its

8    lender, the Debtors turned to developing the framework to pursue a market exploration process

9    and to properly solicit the market. A more detailed factual background of the Debtors' business

10    and operations, as well as the events precipitating the commencement of these Chapter 11 Cases,

11    including a description of the pending litigation over proper calculation of assessments imposed

12    upon the Debtor and the subject of the appeals discussed herein, is fully set forth in the

13    declaration filed at the beginning of these Chapter 11 Cases, the *Declaration of John T. Wertheim*

14    *in Support of the Debtors' Chapter 11 Petitions and Requests for Relief* [Docket No. 4].

15          *C.*      *The Market Exploration Process.*

16          10.     Beginning in March, 2014, the Debtors embarked on a comprehensive

17    restructuring effort, including exploring various strategic alternatives, such as a transaction

18    involving a sale of all of the Debtors' assets or equity investment in the Debtors. The Debtors,

19    together with their advisors, in connection with these restructuring efforts, initiated a sale process,

20    which included actively marketing their assets in an effort to maximize value for all of their

21    constituents. This marketing process included contacting various financial and strategic parties

22    that the Debtors and their advisors believed may have an interest in potentially purchasing some

23    or all of the Debtors' assets or equity (the **"Assets"**) and discussing such possibilities with them.

24    Beginning in June 2014, the Debtors or their advisors: (i) contacted one hundred forty-six (146)

25    potential purchasers or investors and provided interested parties with a request to participate in

26

PHX 331237015v5

Case 2:14-bk-03518-MCW    Doc 267    Filed 09/30/14    Entered 09/30/14 12:51:54    Desc
Main Document     Page 5 of 37

the process (a **"Teaser"**), (ii) received preliminary indications of interest from forty-eight (48) parties, and (iii) entered into confidentiality agreements (each, a **"Confidentiality Agreement"**) with thirty-five (35) parties. These parties were then provided with a confidential information memorandum as well as access to a data room that allowed the interested parties to conduct initial due diligence and determine whether they would like to continue to participate in the process. Of those thirty-five (35) parties, seven (7) expressed continued interest in purchasing the Debtors' Assets and submitted a letter of intent (**"LOI"**). Based on the LOIs submitted, the Debtors invited the interested parties to continue their participation in the process. The interested parties were then invited to conduct management interviews at the Phoenix headquarters, tour the manufacturing facility in North Carolina, and complete due diligence. The Debtors completed the solicitation process and requested offers to be submitted on or around September 2, 2014. After receiving the offers, the Debtors evaluated and negotiated terms of the offers, attempting to achieve the best terms and conditions for the estate.

11. At the end of that process, the Debtors and Prime Time International Acquisition LLC (the **"Stalking Horse"**) engaged in extensive negotiations around a transaction whereby the Stalking Horse would acquire the Debtors' assets subject to higher and/or better bids. The negotiations resulted in a proposed Stalking Horse bid, the terms of which are set forth below in the Motion. Generally, if approved as a Stalking Horse bid, the proposed offer will provide a transaction that will pay all secured debt and administrative claims, assume post-petition payables, provide a going concern for the Debtors and their employees, and permit the Debtors to conduct an auction seeking higher and better offers.

12. As a result of these negotiations, the Debtors and Stalking Horse have agreed to pursue a sale of substantially all of the Debtors' assets (the **"Assets"**), subject to and pursuant to a purchase agreement (the **"Purchase Agreement"**) and the Bid Procedures detailed herein. Given the Debtors' liquidity constraints and the difficulty of obtaining long-term financing to support

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-6-

the Debtors in a reorganization, the Debtors believe that a sale of their Assets in the manner described herein is necessary to maximize value for the Debtors' estates and their creditors. The Declaration of Matthew Foster in support of this Motion is filed contemporaneously herewith.

**D.      *The Proposed Sale.***

13.    The Debtors believe that it is in the best interests of their estates to enter into the Purchase Agreement. The following sub-paragraphs summarize key provisions of the Purchase Agreement, but are qualified in their entirety by reference to the actual Purchase Agreement:

a.      <u>Purchase Price</u>. The aggregate consideration for the sale and transfer of the Assets (the **"Purchase Price"**), shall be calculated as an amount not to exceed $8,150,000. The Purchase Price is calculated as the sum, as of the Closing Date, of the following: (i) the lesser of (x) $3,350,000 and (y) the aggregate amount outstanding under the Loans (the "**Chase Payment**"), to be paid in cash to the Prepetition Lender to satisfy the Loans; plus (ii) the assumption of post-petition date trade accounts payable in an amount not to exceed $1,450,000, excluding the payables referred to in clause (v) below (the "**A/P Assumption**"); plus (iii) the lesser of (x) $1,750,000 and (y) amounts owed to the United States Department of Agriculture in respect of allowed post–petition USDA Assessment claims (the "USDA Payment"), which USDA Payment shall be made in cash; plus (iv) the lesser of (x) $450,000 and (y) the budgeted outstanding and unpaid Administrative Claims or costs incurred from the Petition Date through and including the Closing Date, including allowed and unpaid Professional Fees and US Trustee fees) as of the Closing Date (the "**Administrative Payment**"), which Administrative Payment shall be made in cash or escrow as of the Closing Date; plus (v) the assumption of post-petition insurance premium balances not to exceed $250,000 (the "**Insurance Payable Assumption**"); plus (vi) the lesser of (x) $900,000 and (y) any unpaid amount due to the Tobacco Tax and Trade Bureau (the "**TTB Payment**") unpaid as of the Closing Date, which TTB Payment shall be made in cash to the Tobacco Tax and Trade Bureau as of the Closing Date; plus (vii) the amount of the obligations outstanding under the DIP Facility as of the Closing Date (the "**DIP Payment**"). In no event shall the Purchase Price exceed $8,150,000 (with any assumed obligations set forth in this **Section 1.3** valued at face). For the avoidance of doubt, only the Chase Payment, the USDA Payment, the Administrative Payment, the TTB Payment and the DIP Payment shall be made in cash, with the A/P Assumption and the Insurance Payable Assumption components of the Purchase Price to be satisfied by the assumption of such obligations by the Buyer pursuant to Section 1.2

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331237015v5

GREENBERG TRAURIG
LAW OFFICES
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

hereof. Notwithstanding the foregoing, the DIP Payment may be made by book entry (by cancelling such indebtedness) in the event that the Buyer is the lender under the DIP Facility.

b.   <u>Acquired Assets</u>.   Substantially all of the real and personal tangible and intangible assets owned by the Debtors, including (but not limited to) real estate, accounts receivable, intellectual property, tax refunds and credit, goodwill, cash on hand, and residual proceeds in escrow account held in connection with the Master Tobacco Settlement Agreement:

c.   <u>Excluded Liabilities</u>.   Debtors shall retain all liabilities and obligations that are not Assumed Liabilities, as described in the Purchase Agreement.

d.   <u>Due Diligence or Financing Condition</u>.   There are no due diligence or financing conditions.   The Stalking Horse's offer is contingent on the Stalking Horse being able to obtain by March 15, 2015, all necessary licenses and permits needed to operate the Debtors' Business.   If closing does not occur by December 15, 2015, the Stalking Horse shall provide a loan in the amount of up to $3,600,000.00 as set forth in Annex A to the Purchase Agreement.

e.   <u>Closing</u>.   The Closing shall occur no more than 10 calendar days of the satisfaction or waiver of conditions and deliverables set forth in the Purchase Agreement.

f.   <u>Termination</u>.   The rights of the Debtors and Stalking Horse to terminate the Purchase Agreement are set forth in Article XII of the Purchase Agreement.

g.   <u>No Stay</u>.   Relief from the fourteen day stay of Bankruptcy Rule 6004(h) and 7062 is requested herein.

14.   The Debtors believe that the Sale will provide the best means to maximize value for all of their constituencies.  Upon approval of the Bid Procedures, the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse, in an effort to achieve maximum value for the benefit of all of their constituents.

### III.   <u>Relief Requested</u>

15.   By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures, including the form of the Purchase Agreement and the Breakup Fee (as defined below) with respect to the Sale of the Assets, (ii)

-8-

scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections to the Assigned Contracts, and (v) granting related relief; and (b) the Sale Order (i) authorizing and approving the Purchase Agreement, (ii) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Purchase Agreement, (iii) authorizing the assumption and assignment of the Assigned Contracts, and (iv) granting related relief.

16.    As described above, the Debtors, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with their professionals, determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be (i) to enter into the Purchase Agreement subject to higher and better bids and (ii) to proceed with the Sale process. The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders.

**Proposed Bid Procedures**

17.    The Bid Procedures (as summarized below) were developed consistent with the objective of promoting active bidding that will result in the highest or best offer for the Assets while affording appropriate protection for the Stalking Horse. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially-capable, motivated bidders who are likely to close the transaction.

18.    The Debtors seek to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Purchase Agreement attached as an exhibit to the Bid Procedures, for the purchase of (i) substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims and

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-9-

encumbrances attaching to the sale proceeds, or (ii) investment and purchase of the equity in the Debtors.

19.     Attached to **Exhibit C** to this Motion are the proposed Bid Procedures.  The Bid Procedures provide all information required by Local Rule 6004-1, including: (i) the date, time and place at which the Auction will be conducted and the method for providing notice to parties of any changes thereto; (ii) the name or representative's name of the prospective buyer and whether the prospective buyer is an insider; (iii) a description of the property or interest to be sold in reasonable detail; (iv) all entities known or believed to hold interests, in the property to be sold; (v) whether the sale is free and clear of liens, claims or interests, or subject to them, and a description of any such liens, claims or interests; (vi) the terms and conditions of the offer; (vii) whether the property may be viewed, and if so, when and where; (viii) whether the offer is subject to higher and better bids; (ix) the date by which the objections must be filed and served; (x) whether any compensation will be paid from the sale proceeds, if so, to whom and whether such recipient is an insider; (xi) whether there is an appraisal of the property, and if so, the value of the property stated therein; and (xii) whether any motions for stay relief have been filed as to this property and by whom.  The Bid Procedures are typical for asset sales of this size and nature, require a deposit, and require that a bidder be a "**Qualified Bidder**" as defined in the Bid Procedures.

20.     The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures.[1]

     a.   Purchaser:  Prime Time International Acquisition LLC.  Purchaser is not an insider.

     b.   Assets to be Sold.  Substantially all of the real and personal tangible and intangible assets owned by the Debtors.

---

[1] Capitalized terms not defined in the below sub-paragraphs shall have the meanings ascribed to them in the Bid Procedures attached hereto as **Exhibit C**, or the Agreement, as applicable.

PHX 331237015v5

-10-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

c.    Participation Requirements.  Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process and obtain due diligence access, a potential bidder must first deliver (unless previously delivered) to the Debtors' financial advisor and counsel, an executed confidentiality agreement and nondisclosure agreement in form and substance reasonably acceptable to the Debtors (each, a "**Confidentiality Agreement**") and no less protective of the Debtors than the confidentiality and nondisclosure agreement entered into by the Debtors and Stalking Horse.  Parties already participating in the process may continue to participate based upon their existing Confidentiality Agreement.

d.    Qualified Bid.  To be eligible to participate in the bidding process, each Qualified Bidder, other than the Stalking Horse, must deliver to the Debtors, the Debtors' counsel, and the Stalking Horse's counsel, a written, irrevocable offer to be received by the Bid Deadline (defined below) and compliant with each of the following conditions:

i.      State that the Qualified Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Purchase Agreement (as determined by the Debtors in their business judgment and taking into account the Bid Protections);

ii.     Be accompanied by a clean and duly executed and binding Purchase Agreement or alternate purchase and sale agreement (together with the exhibits and schedules thereto, a **"Modified Agreement"**);

iii.    Be accompanied by a marked Modified Agreement reflecting any variations from the Purchase Agreement;

iv.     Be accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned under such Written Offer;

v.      Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Purchase Agreement or Modified Agreement, which evidence is satisfactory to the Debtors in their discretion including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of title 11 of the Bankruptcy Code in a form requested

-11-

by the Debtors;

vi. To the Debtors' satisfaction, (i) fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval in connection with the consummation of any proposed transaction;

vii. State that the Written Offer is irrevocable until the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder or a Backup Bidder;

viii. Not request or entitle the Qualified Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

ix. Not contain any material due diligence or financing contingencies as determined by the Debtors in their reasonable discretion;

x. Provide evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement or Modified Agreement to the Debtors' satisfaction;

xi. Include a good faith deposit (the **"Good Faith Deposit"**) in the form of a certified check, wire transfer or such other form as is acceptable to the Debtors payable to the order of Prime Time International Company (or such other party as the Debtors may determine) in an amount equal to at least 10% of the purchase price set forth in the Written Offer;

xii. Set forth the anticipated timeframe for (i) obtaining any required approvals, and (ii) consummating the proposed transactions;

xiii. Include a written acknowledgement by such Qualified Bidder that it agrees to the terms of the Bidding Procedures;

xiv. Include such other information as may be reasonably requested in writing by the Debtors at least two (2) calendar days prior to the Auction; and

xv. Provide for a closing date (the **"Closing Date"**) which shall be no later than 15 days after the date of the Sale Hearing or such later

-12-

date as is acceptable to the Debtors.

e. <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse, shall be [_____, 2014, at 5:00 p.m.] (Prevailing Arizona Time) (the "**Bid Deadline**"). A bid received after the Bid Deadline shall not constitute a Qualified Bid.

f. <u>Auction</u>. Only in the event that the Debtors receive two or more Qualified Bids by the Bid Deadline, the Debtors shall conduct an Auction of the Assets to determine the highest or otherwise best bid with respect to the Assets. No later than [_____, 2014 at 12:00] p.m. (Prevailing Arizona Time), the Debtors will notify all Qualified Bidders and counsel to the Stalking Horse whether the Auction will occur. The Auction shall commence at 10:00 a.m. (Prevailing Arizona Time) on [November __, 2014] at the United States Bankruptcy Court for the District of Arizona, 230 N. First Avenue, Courtroom 702, Phoenix, Arizona 85003. The following procedures shall govern any Auction:

i. Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii. The Debtors, in their discretion, may conduct the Auction, in the manner that they determine, in their business judgment and may adopt rules for the Auction at the Auction that, in the Debtors' business judgment, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Purchase Agreement. All such rules will provide that: (i) the Auction procedures must be fair and open, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way as compared to any other participating Qualified Bidder, and (ii) all participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction. Each bid by a Qualified Bidder at the Auction, if not inconsistent with the provisions of these Bid Procedures, shall be deemed to constitute a Qualified Bid;

iii. The Debtors will arrange for the actual bidding at the Auction to be transcribed;

iv. Each Qualified Bidder participating in the Auction will be expected to confirm at the Auction that it has not engaged in any collusion

-13-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

regarding these Bid Procedures with any other Qualified Bidder, in connection with the Auction or any proposed transaction relating to the Assets or a portion thereof;

v.   At the Auction, the first bid for the Assets other than the offer of Stalking Horse set forth in the Purchase Agreement shall be considered only if it exceeds the purchase price set forth in the Purchase Agreement by a minimum amount of not less than $350,000. Subsequently, bidding will continue in minimum increments of at least $100,000, with the specific increments for each round of bidding to be announced on the record at the Auction;

vi.   All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then current highest or best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then current highest or best bid;

vii.   In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Modified Agreement, as applicable, at the Auction, provided, however, that any such modifications to the Purchase Agreement or Modified Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors;

viii.   Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable identify and determine in its business judgment the highest and/or best Qualified Bid for the Assets (the **"Successful Bid"** and the entity or entities submitting such Successful Bid, the **"Successful Bidder"**), taking into account the Stalking Horse's entitlement to the Bid Protection, if applicable, and advise the Qualified Bidders of such determination, and require the Successful Bidder (other than Stalking Horse) to deliver an executed Purchase Agreement or Modified Agreement prior to commencement of the Sale Hearing;

ix.   In addition, the Debtors will determine which Qualified Bid, if any, is the next highest and/or best Qualified Bid and designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated transaction. A Qualified Bidder that submitted a Qualified Bid that is designated a Backup Bid is a **"Backup Bidder."** The Backup Bid shall be the amount of

-14-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

the Backup Bidder's final bid *except if* only one other Qualified Bidder bids at the Auction in addition to the Stalking Horse, and the Stalking Horse is the Backup Bidder, in which case the Stalking Horse's Backup Bid shall be the amount set forth in the original Purchase Agreement with the Stalking Horse. Each Backup Bid shall remain open and binding until the earlier of (i) two business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (ii) eighteen (18) days after the date of the Auction; and

x.  Following the conclusion of the Auction, the Debtors may resume bidding on such procedures determined by the Debtors in their discretion for the sale of discrete assets not sold to the Successful Bidder.

g.  Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on [_____], at [_____.m.] (Prevailing Arizona Time), or on such other date as the Court may direct.

h.  Modifications. The Bid Procedures may be modified by the Debtors *provided that* all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction.

21.  In accordance with the terms of the Bid Procedures and subject to the terms of the Purchase Agreement, the Debtors reserve the right to cancel or postpone the Auction, the sale of the Assets or the Sale Hearing. In addition, the Debtors, with the consent of the Buyer or as otherwise ordered by the Bankruptcy Court, reserve the right to (a) waive the terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional conditions with respect to potential bidders, (c) amend the Bid Procedures.

***Breakup Fee***

22.  The Debtors seek approval to pay a Breakup fee (the "**Breakup Fee**") of $326,000.00 in the event that the Stalking Horse is not the purchaser of the Assets in recognition of the Stalking Horse's substantial expenditure of time, energy and resources, the risk it has taken and the opportunities it has foregone by maintaining a cash reserve sufficient to fulfill the terms of the Purchase Agreement, which provides for a cash sale, and the benefits to the Debtors'

-15-

estates of securing a "stalking horse" or guaranteed minimum bid.

23.    The Breakup Fee is required by the Purchase Agreement. The Debtors believe that the Breakup Fee is fair and reasonable, given the benefits to the estates of having a definitive Purchase Agreement and the risk to the Stalking Horse that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtors' estates.

24.    The Purchase Agreement and the Stalking Horse's monetary offer will form the basis upon which other bids will be submitted and evaluated. The establishment of the Breakup Fee permits the Debtors to insist that competing bids for the Assets be higher or otherwise better than the purchase price under the Purchase Agreement, which is a clear benefit to the Debtors' estates. The Stalking Horse offer sets a beneficial floor for the transaction, both in price and in terms of the offer. The Stalking Horse is not in the tobacco industry, but is an investment entity, such that no financing contingency appears in the Purchase Agreement. This benefits the Estate by giving assurance that the Pre-Petition Lender, the U.S. Department of Agriculture, the Tobacco Tax and Trade Bureau, and the Administrative Claims can be paid in cash as set forth in the Purchase Agreement. Thus, even if the Stalking Horse is ultimately not the Successful Bidder, and thus is paid the Breakup Fee, the Debtors will still have benefited significantly from the Purchase Agreement, due to the floor established by the Stalking Horse leading to an improved bid and increasing the likelihood that the terms and price at which the Assets will be sold will be favorable to the Estate.

*Notice of Auction*

25.    The Debtors seek to have the Auction scheduled for a date no later than October 27, 2014. It is imperative to move forward with the Auction and the Sale promptly because the Debtors have limited financing available to them. Also, the Debtors' key customers, vendors and potential bidders may lose confidence in the certainty of the Sale process and the future of the Debtors' business, if the Auction is further delayed.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-16-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

26.     Within three (3) business days of the entry of the Bid Procedures Order, the Debtors will serve by first class mail, postage prepaid, copies of: (i) the Bid Procedures Order; and (ii) the Sale Notice, substantially in the form annexed hereto as **Exhibit E**, upon the following entities: (a) the Office of the United States Trustee for the District of Arizona; (b) counsel to the Debtors' prepetition lender; (c) all taxing authorities having jurisdiction over any of the Assets subject to the sale, including the Internal Revenue Service; (d) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (e) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order; (f) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Assets; (g) all Contract Parties; (h) counsel to the Stalking Horse; (i) counsel for Attorneys General for the states in which the Debtors conduct business; and (j) all potential bidders previously identified or otherwise known to the Debtors (collectively, the "**Notice Parties**").  In addition, within three (3) business days after entry of the Bid Procedures Order, the Debtors will serve by first class mail, postage prepaid, a copy of the Auction and Sale Hearing Notice, substantially in a form annexed hereto as **Exhibit F**, upon all other creditors.

27.     The Debtors further request that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Arizona, 230 N. First Ave., Suite 101, Phoenix, Arizona 85003; and (d) be served so as to be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Debtors' prepetition lender; (iv) the Office of the United States Trustee; (v) counsel to the Stalking Horse; and (vi) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1(b) on or before five business days preceding the Sale Hearing at 5:00 p.m. (Prevailing Arizona Time).

28.     To facilitate and effect the Sale, the Debtors will be required to assume and/or

-17-

assign the Assigned Contracts, to the Stalking Horse, or as applicable, to the Successful Bidder.

***Cure Procedures***

29.     Given the number of executory contracts and unexpired leases to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale, which amount shall include all pre- and post-petition amounts the Debtors owe the non-debtor party under each Assigned Contract that have accrued and not been paid prior to Closing  (collectively, the "**Cure Amounts**"), and (b) the deadline for objections to the assumption and/or assignment of contracts and leases to be assumed and/or assigned in connection with the Sale (collectively, the "**Cure Procedures**").

30.     The Debtors shall prepare and distribute to non-Debtor parties to the Assigned Contracts a notice, substantially in the form annexed hereto as **<u>Exhibit D</u>** (a "**Cure Notice**"), listing (i) the Assigned Contract(s) to be assumed by the Debtor and then assigned to the Successful Bidder; and (ii) the Cure Amount(s), if any, no later than two (2) business days after entry of the Bid Procedures Order.

31.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assigned Contracts, the Debtors propose the following deadlines and procedures:

> a.     The non-Debtor parties to the Assigned Contracts shall have until 5:00 p.m. (Prevailing Arizona Time) on [_____, 2014] (the "**Contract Objection Deadline**"), which deadline may be extended in the sole discretion of the Debtors, to object (a "**Contract Objection**") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assigned Contracts in connection with the Sale; <u>provided</u>, <u>however</u>, if the Debtors amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties to the added contract or lease or to the reduced Cure Amount contract or lease shall have until seven (7) days after such amendment to submit a Contract Objection (the "**Amended Contract Objection Deadline**").

-18-

PHX 331237015v5

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

b.  Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assumed and Assigned Agreement in connection with the Sale shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assigned Contracts(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 5:00 p.m. (Prevailing Arizona Time), on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Amounts (the "**Disputed Cure Amount**"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse or the Successful Bidder, as applicable, of such consensual resolution, the Debtors shall promptly provide the Stalking Horse or the Successful Bidder, as applicable, notice and opportunity to object to such proposed resolution; (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter; or (c) the Stalking Horse or the Successful Bidder, as applicable, may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

32.  Unless an objection to the assumption and assignment of an Assigned Contract is filed and served before the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable, all counterparties to the Assigned Contracts shall be (i) forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assigned Contracts, and the Debtors and the Stalking Horse, or Successful Bidder, as applicable, shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) deemed to have consented to the assumption and assignment, and (iii) forever barred and estopped from asserting or claiming against the Debtors or the Stalking Horse, or the Successful Bidder, as applicable, that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Assigned Contracts.

-19-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

33.     To the extent a non-debtor party believes that an Assigned Contract requires such a party's consent right to the assignment of such Assigned Contract to the Stalking Horse or the Successful Bidder, as applicable, such non-debtor party must raise this issue in its objection which must be filed before the Contract Objection Deadline or Amended Contract Objection Deadline.  If no timely objection is raised, such other non-debtor parties to an Assigned Contract shall be barred and estopped from asserting or claiming that their Assigned Contract contains an enforceable consent right.

*Corporate Action*

34.     The Debtors further request that no further corporate action of the Debtors or approval of any Debtor's equity security holders shall be required to authorize the Debtors to consummate the transactions contemplated by the Agreement.  Except as expressly permitted by any Orders granting this Motion, the Debtors request that all holders of claims against and interests in, and equity security holders of the Debtors be forever barred, estopped and enjoined from commencing, prosecuting or continuing in any manner any action or other proceeding of any kind against the Debtors' employees, officers or directors, or their professionals and advisors, on account of or related to the Agreement or the transactions contemplated thereby, provided, however, that nothing in any Order granting this Motion shall prevent any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

### IV.     Basis for Relief

**A.     The Bid Procedures Order Should be Entered on the Terms Proposed.**

*1.     The Bid Procedures are Fair, Appropriate, and Should be Approved.*

35.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction.  The Debtors respectfully submit that the sale of the Assets, pursuant to the Bid Procedures and by public auction, will ensure that the

-20-

PHX 331237015v5

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    bidding process with respect to the Assets is fair, reasonable, and will yield the maximum value

2    for their estates and creditors.

3        36.    Courts uniformly recognize that procedures intended to enhance competitive

4    bidding are consistent with the goal of maximizing the value received by the estate and therefore

5    are appropriate in the context of bankruptcy sales.  *See In re Montgomery Ward Holding Corp.*,

6    Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) [Docket No. 377]; *In re Fruehauf Trailer*

7    *Corp.*, Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) [Docket No. 439]; *see also In re*

8    *Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value

9    of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991)

10   (as amended) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate

11   basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of

12   bankrupt estates").

13       37.    The Bid Procedures, as proposed herein, contemplate a schedule for conducting

14   the Auction and the Sale Hearing.  The Debtors have undertaken an extensive market exploration

15   process and have negotiated a proposed transaction beneficial to its constituents.  To the extent

16   that the Debtors are unable to adhere to the timeline proposed herein, they likely would deplete

17   their cash reserves within weeks and be without court-authorized use of cash collateral.  Any

18   interruption in the Debtors' market exploration process or business operations would irreparably

19   damage the value of the Debtors' assets and businesses to the detriment of the Debtors, their

20   estates, and their creditors.  Thus, the sale process is necessary under the circumstances and

21   provides the best mechanism to maximize value for the Debtors and their estates.

22       38.    In addition, similar procedures have been previously approved by this Court and

23   others.  *See In re Eurofresh, Inc.,* Case No. 13-01125 (EWH) (Bankr. D. Ariz. March 4, 2013)

24   [Docket No. 170]; *In re Dewey Ranch  Hockey, LLC,* Case No. 09-09488 (RTB) (Bankr. D. Ariz.

25   June 4, 2009) [Docket No. 260]; *In re Electric Transportation Engineering Corporation,* Case

26

-21-

No. 13-16126 (RJH) (Bankr. D. Ariz. September 19, 2013) [Docket No. 48]; *In re Arizona Heart Institute, Ltd.,* Case No. 10-24062 (GBN) (Bankr. D. Ariz. September 16, 2010) [Docket No. 162]; *In re Humboldt Creamery, LLC,* Case No. 09-11078 (Bankr. N.D. Cal. July 28, 2009); *In re Asyst Techs, Inc.,* Case No. 09-43246 (Bankr. N.D. Cal. June 8, 2009); *In re Nortel Networks, Inc.,* Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) [Docket No. 1012]; *In re Tweeter Home Entm't Group, Inc.,* Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) [Docket No. 211]; *In re Radnor Holdings Corp.,* Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) [Docket No. 277].

39.    Accordingly, the Debtors request that the Court approve the Bidding Procedures, including the timetable for the sale process set forth herein.

> 2.    *The Stalking Horse Protections Have Sound Business Purpose and Should be Approved.*

40.    Approval of the Stalking Horse Protections is governed by general administrative expense jurisprudence under Bankruptcy Code section 503(b). *In re Reliant Energy Channelview LP,* 594 F.3d 200, 206 (3d Cir. 2009); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.),* 181 F.3d 527, 535 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that the termination as to whether to approve break-up fees "depends upon the requesting party's ability to show that the fees [or expenses] were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535.

41.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor on which other bidders can rely, "the bidder may have

-22-

PHX 331237015v5

Case 2:14-bk-03518-MCW   Doc 267   Filed 09/30/14   Entered 09/30/14 12:51:54   Desc
Main Document   Page 22 of 37

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1  provided a benefit to the estate by increasing the likelihood that the price at which the debtor is

2  sold will reflect its true worth." *Id.*

3     42.   In addition, courts in the Ninth Circuit have held that, in considering whether to

4  approve a break-up fee, the court must determine whether transaction will "further the diverse

5  interests of the debtors, creditors and equity holders, alike." *In re America West Airlines, Inc.,*

6  166 B.R. 908, 912 (Bankr. D. Ariz. 1994) *quoting In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d

7  Cir. 1983), and "be carefully scrutinized to insure that the debtor's estate is not unduly burdened

8  and that the relative rights of the parties in interest are protected." *Id., citing In re Hupp Indus.,*

9  *Inc.,* 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).

10    43.   Here, the proposed Breakup Fee should be approved because they will provide a

11 clear benefit to the Debtors' estates and is actually necessary to preserve the value of the Debtors'

12 estates.  The ability to grant a Breakup Fee will enable the Debtors to potentially secure an

13 adequate floor and, thus, insist that competing bids be materially higher or otherwise better than

14 any agreement that might be entered into with the Stalking Horse.  Thus, the Debtors' ability to

15 offer potential bidders the Breakup Fee enables them to ensure the sale of the Assets to a

16 contractually-committed bidder at a price they believe to be fair while, at the same time,

17 providing the Debtors with the ability to generate a higher purchase price to benefit their estates.

18    44.   The Breakup Fee, as requested herein, is reasonable and appropriate in light of the

19 size and nature of the contemplated transaction and the efforts that have been and will be

20 expended by the Stalking Horse.  The Stalking Horse has expended considerable time and effort

21 researching the Debtor and the proposed transaction, foregoing the opportunity to put the time

22 and effort to profitable use in other ventures because it was working on the Purchase Agreement

23 in the case.  The proposed Break Up Fee is $326,000, which is 4% of the maximum purchase

24 price of $8,150,000 described in the Purchase Agreement.  In *In re Ariz. Heart Inst., Inc.,* 2010

25 Bankr. LEXIS 5841 (Bankr. D. Ariz. September 30, 2010), this Court approved an Asset

26

-23-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Purchase Agreement containing a breakup fee. The Asset Purchase Agreement on file with the Court (Case No. 10-bk-24062-GBN, DE No. 4-1) in that case reflects a purchase price of some $6,050,000.00 together with a breakup fee of 4% of the purchase price, together with the Buyer's reasonable out-of-pocket legal fees and other expenses up to an additional $250,000. *See* orders approving bid protections, *In re Arizona Heart Institute, Ltd.,* Case No. 10-24062 (GBN) (Bankr. D. Ariz. September 7, 2010) [Docket No. 130] and (Bankr. D. Ariz. September 16, 2010) [Docket No. 162]. Given the provision for fees and expenses, the breakup fee in *In Re Arizona Heart Institute* ranged from 4% at a minimum to a possible maximum of more than 8%. The Break Up Fee here is squarely within that range.

45. Finally, authority to pay a Breakup Fee will not diminish the Debtors' estates. The Debtors do not intend to terminate a Stalking Horse Purchase Agreement, if doing so would incur an obligation to pay a Breakup Fee, unless the Debtors determine, in their business judgment, that accepting an alternative bid will result in consideration in an amount greater than the aggregate amount of the Stalking Horse Bid together with the Stalking Horse Protections. Therefore, even if the Stalking Horse is ultimately not determined to be the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid.

46. As a result, the Debtors submit that the Stalking Horse Protections will not chill bidding on the Assets and will clearly benefit the Debtors' estates. Accordingly, the Debtors request that the Court approve and authorize the Stalking Horse Protections.

### B. The Notice Procedures are Reasonable and Appropriate.

47. Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections. The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed

PHX 331237015v5

sale of the Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets. Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedure proposed above, including the form and manner of service of the Sale Notice.

### C.     *The Sale of Substantially All of the Debtors' Assets Should be Approved.*

1.     *The Sale of Assets Under Bankruptcy Code Section 363 is Warranted.*

48.     Ample justification exists for approval of the proposed sale of the Assets. Bankruptcy Code section 363 provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

49.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Trans World Airlines, Inc.,* 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

50.     Courts typically consider the following factors in determining whether to approve a sale under Bankruptcy Code section 363:  (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  *See In re Delaware & Hudson Ry.,* 124 B.R. at 176; *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.,* No. 97-1159, 1997 WL 176574, at *4 and n.2 (D.N.J. Mar. 26, 1997).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

51.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983).   In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,* 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) (""It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate" (quoting *In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

52.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res.,* 147 B.R. at 656 (*quoting Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.),* 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

PHX 331237015v5

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

53.     The Debtors submit that the proposed sale of the Assets is within their sound business judgment.  The Debtors have considered all alternatives, with the assistance of their advisors, and determined that the sale of their Assets through a 363 sale process governed by the Bidding Procedures will maximize the value of the Debtors' estates and is in the best interests of their estates and creditors.  As set forth above and in the First Day Declaration, because of their inability to refinance their secured debt and repay the alleged amounts due for the assessment, the Debtors' present financial condition warrants a sale through the market exploration process.  The Debtors do not have sufficient working capital or access to financing to rebuild and rehabilitate their assets and operations during the chapter 11 cases if the alleged prepetition assessment amount is not reduced.  Thus, a sale provides the best mechanism to maximize value under the circumstances, will provide an opportunity for the Debtors' otherwise successful business to continue to operate and employ several dozens of people and is a valid exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the sale of the Assets to the Successful Bidder be approved.

> 2.     *The Sale of Assets Should be Free and Clear of all Liens, Claims, Interests, and Encumbrances.*

54.     In the interest of attracting the best bids for the Assets, the Debtors submit that the sale of the Assets should be free and clear of any and all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), with any such liens, claims, interests, and encumbrances attaching to the proceeds of a sale.

55.     Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;

-27-

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(F)(1) – (5).

56.     This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

57.     Because Bankruptcy Code section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests. *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens" (*citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re Dundee Equity Corp.,* 1992 WL 53743, at *4 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

58.     The Debtors submit that one or more of the conditions set forth in Bankruptcy Code section 363(f) will be satisfied with respect to the sale of the Assets. In particular, section 363(f)(2) will be met in connection with the transactions proposed because it is anticipated that each of the parties holding liens, claims or encumbrances on the Assets will consent, or, absent any objection to the Motion, will be deemed to have consented to the sale. Further, any such lien,

-28-

claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, the Debtors request that the Assets be sold and transferred to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to Bankruptcy Code section 363(f).

        *3.      The Successful Bidder Should be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.*

      59.     Bankruptcy Code Section 363(m) protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

      60.     The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that the selection of the Successful Bidder shall be the product of arm's-length, good-faith negotiations in an anticipated competitive sale process. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing and in the Sale Order that the Successful Bidder has purchased the Assets in good faith and is entitled to the full protections of Bankruptcy Code section 363(m).

**D.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved.**

        *1.      Assumption and Assignment Based on Debtors' Business Judgment.*

      61.     As stated above, in order to facilitate and effectuate the sale of their Assets, the Debtors also seek authority to assume and assign certain Assigned Contracts to the Successful

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-29-

Bidder(s). Bankruptcy Code sections 365(a) and (b) authorize debtors in possession to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or r any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

62. A debtor's decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the Court to approve the assumption under Bankruptcy Code section 365(a). *See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.,* 872 F.2d 36, 40 (3d Cir. 1989); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993); *see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523* (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); *In re III Enter., Inc. V,* 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), *aff'd*, 169 B.R. 551 (E.D. Pa. 1994).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331237015v5

-30-

Case 2:14-bk-03518-MCW    Doc 267    Filed 09/30/14    Entered 09/30/14 12:51:54    Desc
Main Document    Page 30 of 37

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

63.     It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." *See In re Decora Indus., Inc.,* 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),* 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"). *See also Phar Mor, Inc. v Strouss Bldg. Assocs.,* 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract") (citations omitted).[2]

64.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate"). Specifically, a court should find that the assumption or rejection is election on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions Corp.,* 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. *See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.),* 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers,* 756 F.2d 1043, 1047 (4th Cir. 1985).

65.     In the present case, the Debtors' assumption and assignment of certain Assigned Contracts to the Successful Bidder(s) meets the business judgment standard and satisfies the

---

[2] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." *In re Network Access Solutions, Corp.,* 330 B.R. at 74 (citations omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . . . [t]o the extent they are outside the ordinary course of business, court approval is necessary." *Id.* Regardless, "[t]here is . . . no discernible difference in the notice requirements or standard for approval under section 363 and 365." *Id.*

requirements of Bankruptcy Code section 365. The assumption and assignment of the Assigned Contracts are necessary for any Successful Bidder(s) to conduct business going forward, and since no purchaser would take the Assets without certain Assigned Contracts, the assumption and assignment of such Assigned Contracts is essential to inducing the highest and best offer for the Assets. Further, upon consummation of the proposed sale of the Assets, the Debtors will likely no longer continue to operate their businesses and will therefore have no use for any of the Assigned Contracts utilized in their businesses. Lastly, the proposed assumption and assignment procedures ensure that all counterparties to Assigned Contracts to be assumed and assigned by the Debtors will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder(s) to provide adequate assurance of future performance.

66. Consequently, the Debtors submit that the assumption and assignment procedures are fair and reasonable, and respectfully request that the Court approve the assumption and assignment procedures and authorize the Debtors to assume and assign any Assigned Contracts to the Successful Bidder(s).

        *2.      Adequate Assurance of Future Performance.*

67. A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2).

68. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.,* 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle*

PHX 331237015v5

-32-

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

*Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

69.     Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

70.     Pursuant to the Bid Procedures, in order to submit a "Qualified Bid" for the Assets, all potential bidders must provide evidence of such potential bidder's ability to provide adequate assurance of future performance under the Assigned Contracts to be assumed and assigned. *See* Bid Procedures, Section 4.  Moreover, the assumption and assignment procedures permit the non-Debtor counterparties to such Assigned Contracts to request adequate assurance information regarding the Successful Bidder(s), and afford such counterparties the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance under such Assigned Contracts.  Accordingly, in this regard, the assumption and assignment procedures are reasonable and appropriate and support approval of the assumption and assignment of Assigned Contracts to the Successful Bidder(s).

          *3.      Anti-Assignment Provisions Should be Deemed Unenforceable.*

71.     To facilitate the assumption and assignment of Assigned Contracts, the Debtors also request that the Court enter an order providing that any anti-assignment provisions included in, or otherwise purporting to affect, the Assigned Contracts to be assumed and assigned shall not restrict, limit, or prohibit the assumption, assignment, and sale of such Assumed Contracts, and

-33-

that such provisions are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

72.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases 'terms, when to do so will effectuate the purposes of section 365"), *cert denied,* 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.,* 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

73.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.,* 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions"). Similarly, in *In re Mr. Grocer, Inc.,* the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

-34-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

74.     Accordingly, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment, and sale of any Assumed Contracts or Assumed Leases to the Successful Bidder(s) and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

**E.     *Relief Under Bankruptcy Rule 6004(h) and 6004(d) is Appropriate.***

75.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." *See also* Bankruptcy Rule 7062.

76.     The purpose of Bankruptcy Rules 6004(h), 7062 and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008). The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

77.     As described above, time is clearly of the essence. The Debtors lack the working capital or access to further financing to rehabilitate their operations and, absent adherence to the procedures set forth herein, will likely replete cash reserves in the near term and be forced to shut down operations. Such a result would irreparably harm the value of the Assets and, by extension,

PHX 331237015v5

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

their creditors. Therefore, to maximize the value received for the Assets and minimize accruing liabilities, the Debtors seek to consummate the sale of the Assets to the Successful Bidder(s) as soon as possible following the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

78.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a), and (ii) the 14-day stay under Bankruptcy Rule 6004(h) and 7062, to the extent that any of these rules are applicable.

### No Prior Request

79.     No prior Motion for the relief requested herein has been made to this or any other court.

### Notice

80.     Notice of this Motion will be given in the manner set forth in this Motion to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Arizona; (b) counsel to the Debtors' prepetition lender; (c) all taxing authorities having jurisdiction over any of the Assets subject to the sale, including the Internal Revenue Service; (d) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (e) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this order; (f) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Assets; (g) all Contract Parties; (h) counsel to the Stalking Horse; (i) counsel for Attorneys General for the states in which the Debtors conduct business; and (j) all potential bidders previously identified or otherwise known to the Debtors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

-36-

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and that it grant the Debtors such other and further relief as is just and proper.

Dated: September 30, 2014          GREENBERG TRAURIG, LLP

                                        */s/ David D. Cleary*
                                  David D. Cleary, AZ SBN 011826
                                  2375 East Camelback Road
                                  Suite 700
                                  Phoenix, AZ 85016
                                  Telephone: 602-445-8000
                                  Facsimile:  602-445-8100
                                  Email: clearyd@gtlaw.com

                                  *Attorney for the Debtors and Debtors-in-Possession*

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

PHX 331237015v5