# EXHIBIT G

**ASSET PURCHASE AGREEMENT**

**by and among**

**Prime Time International Company, Inc.,**

**21st Century Brands, LLC, and**

**USA Tobacco Distributing, Inc., as the Sellers**

**and**

**Prime Time International Acquisition LLC, as the Buyer**

**Dated as of September 24, 2014**

PHX 331255799v15

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF ASSETS ....................................................................2
    Section 1.1    Purchased Assets and Excluded Assets ...........................................2
    Section 1.2    Assumption and Retention of Liabilities .........................................5
    Section 1.3    Purchase Price ..................................................................................6
    Section 1.4    Consent of Third Parties ..................................................................7
    Section 1.5    Obtaining Orders and Closing .........................................................7

ARTICLE II CONSIDERATION AND MANNER OF PAYMENT ........................................8
    Section 2.1    Payment of the Purchase Price.........................................................8
    Section 2.2    Allocation of the Purchase Price......................................................8
    Section 2.3    Prorations .........................................................................................8

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................9
    Section 3.1    Organization and Qualification ........................................................9
    Section 3.2    Authorization; Enforceability ..........................................................9
    Section 3.3    Organizational Documents ...............................................................9
    Section 3.4    Capitalization ...................................................................................9
    Section 3.5    No Violation .....................................................................................9
    Section 3.6    Consents..........................................................................................10
    Section 3.7    Taxes...............................................................................................10
    Section 3.8    Material Contracts..........................................................................10
    Section 3.9    Real Property ..................................................................................10
    Section 3.10    Personal Property ...........................................................................11
    Section 3.11    Intellectual Property .......................................................................11
    Section 3.12    Licenses and Permits .....................................................................11
    Section 3.13    Employee Benefit Plans; Employees...............................................11
    Section 3.14    Labor Relations...............................................................................12
    Section 3.15    Environmental Matters ...................................................................12
    Section 3.16    Insurance.........................................................................................12
    Section 3.17    No Brokers or Finders.....................................................................12
    Section 3.18    Litigation; Proceedings...................................................................12
    Section 3.19    Compliance with Laws ...................................................................13
    Section 3.20    Accounts Receivable.......................................................................13
    Section 3.21    WARN Act ......................................................................................13
    Section 3.22    Warranties Are Exclusive ...............................................................13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER .....................14
    Section 4.1    Organization and Qualification ......................................................14
    Section 4.2    Authorization; Enforceability ........................................................14
    Section 4.3    No Consents ....................................................................................14
    Section 4.4    Litigation........................................................................................14
    Section 4.5    No Violation ...................................................................................14
    Section 4.6    Available Funds ..............................................................................15
    Section 4.7    No Knowledge of Misrepresentations or Omissions .........................15
    Section 4.8    Brokers...........................................................................................15

i

ARTICLE V COVENANTS OF THE SELLERS ...................................................................... 15
    Section 5.1    Conduct of Business .......................................................................... 15
    Section 5.2    Further Assurances ........................................................................... 16
    Section 5.3    Schedules Updates ............................................................................ 17
    Section 5.4    Reasonable Access; Confidentiality ................................................. 17

ARTICLE VI COVENANTS OF THE BUYER ..................................................................... 18
    Section 6.1    Further Assurances ........................................................................... 18
    Section 6.2    Notification ....................................................................................... 18
    Section 6.3    Employment Covenants and Other Undertakings............................. 18

ARTICLE VII CONDITIONS PRECEDENT TO THE CLOSING ....................................... 19
    Section 7.1    Conditions Precedent to Each Party's Obligations ......................... 19
    Section 7.2    Conditions Precedent to Obligations of the Buyer .......................... 20
    Section 7.3    Conditions Precedent to Obligations of the Sellers ........................ 20

ARTICLE VIII CLOSING ..................................................................................................... 21
    Section 8.1    Time and Place ................................................................................. 21
    Section 8.2    Deliveries by the Sellers .................................................................. 21
    Section 8.3    Deliveries by the Buyer ................................................................... 22

ARTICLE IX POST CLOSING COVENANTS ..................................................................... 23
    Section 9.1    Access to Books and Records........................................................... 23
    Section 9.2    Attorney-Client Privilege ................................................................ 23
    Section 9.3    Confidentiality ................................................................................. 22
    Section 9.4    General ............................................................................................. 23

ARTICLE X TAXES ............................................................................................................... 24
    Section 10.1    Taxes Related to Purchase of Acquired Assets................................ 24
    Section 10.2    Waiver of Bulk Sales Laws .............................................................. 24

ARTICLE XI SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS ............ 25

ARTICLE XII TERMINATION .............................................................................................. 25
    Section 12.1    Termination ...................................................................................... 25
    Section 12.2    Effect of Termination........................................................................ 26

ARTICLE XIII DEFINITIONS ............................................................................................... 27

ARTICLE XIV MISCELLANEOUS ...................................................................................... 33
    Section 14.1    Notices, Consents, etc ...................................................................... 33
    Section 14.2    Severability ...................................................................................... 34
    Section 14.3    Successors; Assignment.................................................................... 34
    Section 14.4    Counterparts; Facsimile Signatures ................................................ 34
    Section 14.5    Expenses ........................................................................................... 34
    Section 14.6    Governing Law ................................................................................. 34
    Section 14.7    Table of Contents and Headings ...................................................... 35
    Section 14.8    Entire Agreement .............................................................................. 35
    Section 14.9    Third Parties .................................................................................... 35
    Section 14.10    Disclosure Generally........................................................................ 35
    Section 14.11    Acknowledgment by the Buyer; Disclaimers .................................. 35

*PHX 331255799v15*

Section 14.12    Interpretive Matters...................................................................... 36
Section 14.13    Construction................................................................................... 37
Section 14.14    Specific Performance..................................................................... 37
Section 14.15    Press Releases and Communications.............................................. 37

*PHX 331255799v15*

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT (**this "**Agreement**") is made and entered into as of September 24, 2014 (the "**Execution Date**"), by and among Prime Time International Company, Inc., an Arizona corporation ("**Prime Time**"), USA Tobacco Distributing, Inc., an Arizona corporation, and 21st Century Brands, LLC, an Arizona limited liability company (each, a "**Seller Subsidiary**" and, collectively, the "**Seller Subsidiaries**," and, together with Prime Time, the "**Seller**" or "**Sellers**" as the context requires), and **Prime Time International Acquisition LLC**, a Delaware limited liability company (the "**Buyer**"). Each of the parties named above may be referred to herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in **Article XIII** below.

## RECITALS

WHEREAS, the Sellers are engaged in the business of manufacturing and marketing of machine made cigars, pipe tobacco and other tobacco products, as well as the distribution and sale of non-tobacco products such as energy drinks and headphones (the "**Business**");

WHEREAS, on March 15, 2014 (the "**Petition Date**"), the Sellers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Petition**") with the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**"), which Petition commenced cases entitled In re: Prime Time International Company, an Arizona corporation, et al., Debtors and Debtors-in-Possession, Case No. 2:14-bk-03518; In re: 21st Century Brands, LLC, an Arizona limited liability company, Debtors and Debtors-in-Possession, Case No. 2:14-bk-03519, and USA Tobacco Distributing, Inc. an Arizona corporation, Debtors and Debtors-in-Possession, Case No.: 2:14-bk-03520 (which cases are jointly administered and will be referred to herein collectively as the "**Bankruptcy Case**");

WHEREAS, the Sellers intend to seek the entry of an order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the transactions contemplated hereby and by other transaction documents;

WHEREAS, under the terms and subject to the conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, each of the Sellers desire to sell to the Buyer all of its assets and to assign to the Buyer certain executory contracts and unexpired leases relating to the Business, and the Buyer desires to purchase from the Sellers such assets and to assume such contracts and unexpired leases and certain other obligations and Assumed Liabilities of the Sellers, upon the terms and subject to the conditions of this Agreement;

WHEREAS, each of the boards of directors of the Sellers believe, following consultation with its financial advisors and reasonable due diligence, that, in light of the current circumstances, a sale of each Seller's assets is necessary to maximize value and is in the best interest of the Sellers and its shareholders and creditors; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to this Agreement and a Sale Order to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code.

# AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to approval of the Bankruptcy Court, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

Section 1.1     <u>Purchased Assets and Excluded Assets</u>.

(a) <u>Purchased Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the Closing Date, upon the terms and subject to the conditions set forth in this Agreement, and in consideration of the Purchase Price to be paid by the Buyer to the Sellers, and the Buyer's assumption of the Assumed Liabilities, as provided herein, the Buyer will purchase and acquire from each of the Sellers, and each of the Sellers will sell, convey, assign, transfer and deliver to the Buyer, all of such Seller's right, title and interest in and to all assets, properties, rights and interests of such Seller as of the Closing Date, other than the Excluded Assets (collectively, the "**Purchased Assets**"), free and clear of all Liens other than Permitted Liens, including, without limitation, the following:

(i)     all Owned Real Property of such Seller;

(ii)     all rights of such Seller under the Assigned Leases, together with all prepaid items and deposits of such Seller as of the Closing Date, and the leasehold improvements, prepaid rent and security deposits in respect of any Assigned Leases;

(iii)     all Inventory of such Seller;

(iv)     all Accounts Receivable of such Seller;

(v)     all Tangible Personal Property of such Seller;

(vi)     subject to the terms and conditions of **Section 1.4**, except as set forth on **Schedule 1.1(a)(vi)**, all rights of such Seller under the Assigned Contracts and the Other Assigned Contracts set forth on **Schedule 1.1(c)**;

(vii)     except as set forth on **Schedule 1.1(a)(vii),** all Intellectual Property of such Seller (which shall include the name "Prime Time International Company, Inc." or any derivation thereof, including "Prime Time");

(viii)     all Licenses and Permits of such Seller, except as set forth on **Schedule 1.1(a)(viii)**;

(ix)     all records and other information pertaining to accounts, personnel and referral sources, all drawings, plats, specifications, reports, studies, plans, books, ledgers, files, documents, correspondence and business and accounting records of every kind (including all financial, business and marketing plans), all advertising, marketing and promotional materials, all invoices, bills of sale and other instruments and documents evidencing such Seller's title to assets that are in the possession of such Seller, and all other printed or written materials, in each case owned by such Seller; <u>provided</u>, <u>however</u>, that such Seller may retain copies of all other

2

documents and records necessary or useful to such Seller in filing any future Tax Returns or in fulfilling its obligations under this Agreement or any of its other obligations that are not assumed by the Buyer, or any other legitimate purpose;

        (x)    all deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds, Claims (including insurance benefits to the extent such benefits relate to a Purchased Asset or Assumed Liability), causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail and other communications of such Seller;

        (xi)    all rights under or arising out of all insurance policies relating to the Business or any of the Purchased Assets (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to such Seller, with respect to cancelled policies), unless non-assignable as a matter of Law;

        (xii)    all product records, trademarks, formulas, brand, design, packaging, product SKUs, components and blends related to all tobacco products manufactured by such Seller (it being the express intent of the Parties to convey all rights necessary to permit, among other things, the continued manufacture and sale of such products without FDA review or approval under any FDA regulation that may grandfather prior products made or sold by such Seller);

        (xiii)    all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of such Seller or with third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction);

        (xiv)    all corporate books and records of internal corporate proceedings, Tax records, work papers and other records that such Seller is not required by Law to retain;

        (xv)    any Claim, right or interest in and to all (or the benefit of all to the extent not assignable) Tax refunds, rebates, abatements, credits and similar items of such Seller relating to the Purchased Assets or the Business, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return;

        (xvi)    all goodwill as a going concern and all other intangible property (including general intangibles) of the Business;

        (xvii)    all rights of such Seller under and to any funds deposited, or any related escrow agreement or arrangement entered into by the Seller, as a result of its status as a non-participating manufacturer under the Tobacco Master Settlement Agreement, including without limitation, the Escrow Agreement, and the funds deposited or held pursuant thereto, dated March 5, 2014, by and between Seller and SunTrust Bank, a Georgia banking corporation (collectively, the "**NPM Escrow Agreement**");

        (xviii)  all Cash on Hand and Cash Equivalents of the Sellers, other than cash consideration payable or deliverable to Sellers under this Agreement;

PHX 331255799v15

(xix)  any other asset, if any, listed on **Schedule 1.1(a)** (regardless of whether such assets are covered by any of the foregoing);

(xx)  (vii)  all causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof; and

(xxi)  all other assets related to, associated with or used in the conduct of the Business and/or the Purchased Assets, excepting therefrom only the Excluded Assets.

(b)  Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer and each Seller shall retain all right, title and interest to, in and under, and all obligations of such Seller with respect to the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of the following items, assets and properties:

(i)  any asset of such Seller that otherwise would constitute a Purchased Asset but for the fact that it is conveyed, leased or otherwise disposed of in the Ordinary Course of Business prior to the Closing Date not in violation of this Agreement;

(ii)  the corporate books and records of corporate proceedings (including, without limitation, stock certificates), Tax records, work papers and other records that Seller is required by Law to retain; provided, however, true and complete copies of the foregoing items shall be provided by Sellers to Buyer;

(iii)  the rights of the Sellers under this Agreement and all Cash and non-Cash consideration payable or deliverable to the Sellers under this Agreement;

(iv)  all checkbooks and cancelled checks of such Seller, it being understood that all Cash on Hand and Cash Equivalents of the Sellers shall be conveyed to the Buyer;

(v)  all shares of capital stock or other equity interests in the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in the Sellers;

(vi)  the assets, if any, listed on **Schedule 1.1(b)**;

(vii)  any Licenses and Permits that are not transferable; and

(viii)  all Contracts that are not Assigned Contracts.

(c)  Assigned Contracts.  At the Closing, the Buyer shall acquire all right, title and interest in and to all of those Contracts (the "**Assigned Contracts**") which the Buyer decides to assume and to have the applicable Seller assign to it, and which are designated as "Assigned Contracts" on **Schedule 1.1(c)**. Assigned Contracts shall not include Contracts identified in a separate schedule provided by the Buyer to the Sellers at least two (2) Business Days before the Auction Date as Contracts to be excluded from the list of designated "Assigned Contracts" on **Schedule 1.1(c)**, notwithstanding the initial inclusion of such Contracts on **Schedule 1.1(c)**. The Sellers hereby acknowledge that the Assigned Contracts shall not include any Contracts that the Buyer decides to exclude from the Assigned Contracts. The Buyer acknowledges and agrees that any Administrative Claim arising by virtue of the assignment and assumption of the Assigned Contracts shall be payable as an Administrative Payment pursuant to **Section 1.3**.

PHX 331255799v15

(d) Assigned Leases. At the Closing, the Buyer shall acquire all right, title and interest in and to all of those Leases (the "**Assigned Leases**") which the Buyer decides to assume and to have the applicable Seller assign to it, and which are designated as "Assigned Leases" on **Schedule 1.1(d)**. Assigned Leases shall not include Contracts identified in a separate schedule provided by the Buyer to the Sellers at least two (2) Business Days before the Auction Date as Leases to be excluded from the Assigned Leases list on **Schedule 1.1(d)**, notwithstanding the initial inclusion of such Leases on **Schedule 1.1(d)**. The Sellers hereby acknowledge that the Assigned Leases shall not include any Leases that the Buyer decides to exclude from the Assigned Leases.

Section 1.2    Assumption and Retention of Liabilities.

(a) Assumed Liabilities. At the Closing, the Buyer shall assume and shall pay, perform and discharge, in accordance with their respective terms and subject to their respective conditions, the following Liabilities of each of the Sellers (the "**Assumed Liabilities**"):

(i)    all Cure Amounts due and owing under any Assigned Contract or Assigned Lease in an amount not to exceed $50,000;

(ii)    the specific liabilities and obligations of Sellers, if any, identified on **Schedule 1.2(a)**;

(iii)    post-Petition trade payables ("**Trade Payables**") and accrued federal and state excise taxes as of the Closing Date in an amount not to exceed $1,450,000;

(iv)    the Sellers' accrued post-Petition United States Department of Agriculture ("**USDA**") assessment claims as of the Closing Date (the "**USDA Payments**") in an amount not to exceed $1,750,000;

(v)    post-Petition obligations of the Sellers related to the Sellers' insurance policies and premiums as of the Closing Date in an amount not to exceed $250,000; and

(vi)    liability for Administrative Claims and Priority Claims that were incurred from the Petition Date through and including the Closing Date in an amount not to exceed $450,000.

(vii)    To the extent not paid by Sellers prior to Closing any amount due to the Tobacco Tax and Trade Bureau as of September 30, 2014 in an amount not to exceed $900,000.

(b) Excluded Liabilities. All Claims against the Sellers, and all liabilities and obligations of the Sellers (in each case of any nature whatsoever, whether direct or indirect, matured or unmatured, known or unknown, absolute, accrued, contingent or otherwise, whether now existing or hereafter arising) which are (x) enumerated below in this **Section 1.2(b)** or (y) not specifically assumed by Buyer pursuant to **Section 1.2(a)** are collectively referred to herein as the "**Excluded Liabilities**." Buyer shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities.  For the avoidance of doubt and without limiting the generality of the foregoing, any product liability or similar claim relating to the products of the Sellers sold or distributed prior to the Closing Date shall be an Excluded Liability, and the Buyer shall not assume any such Liability.  Notwithstanding **Section 1.2(a)**, and without limiting the generality of this Section 1.2(b), the following claims against, and liabilities of, the Sellers are Excluded Liabilities and shall not be assumed or discharged by Buyer:

PHX 331255799v15

(a)    except for those liabilities and obligations specifically assumed by Buyer pursuant to **Section 1.2(a)**, any and all liabilities and obligations for Taxes arising from or with respect to the Purchased Assets or the Business to the extent attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by this Agreement;

(b)    any and all liabilities for indebtedness of the Sellers with respect to borrowed money (other than obligations with respect to capitalized leases that are Assigned Contracts);

(c)    any pre-Closing litigation claim or assessment, breach of Contract, tort, infringement, violation of Law of the Sellers or any of their Affiliates arising from any facts, events or circumstances arising on or prior to the Closing Date, in each case, of any kind or nature whatsoever and whether related to the Purchased Assets or the Business or otherwise and regardless of when commenced;

(d)    any and all liabilities and obligations for: (i) costs and expenses incurred by the Sellers or owed in connection with the administration of the Bankruptcy Case (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Sellers, the fees and expenses of the post-Petition lenders and pre-Petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of the Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(e)    any liabilities of a Seller under those Contracts and Licenses and Permits which constitute Excluded Assets or which are not assigned to the Buyer pursuant to the provisions of this Agreement;

(f)    any liabilities relating to any employees, former employees (or dependents thereof) of a Seller arising from any facts, events or circumstances arising on or prior to the Closing Date, and any liabilities relating to any Employee Benefit Plan of a Seller, including, without limitation, any stock option or profit sharing plan;

(g)    any and all liabilities and obligations (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (iii) relating to any bodily injury, or damage to property, incurred by any Person (including any tobacco related or product liability suit) or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing (including, without limitation, all matters noticed or pending and scheduled on **Schedule 3.18** and any such liabilities or obligations that otherwise would be Assumed Liabilities).

Section 1.3    <u>Purchase Price</u>.  Subject to the prorations set forth in **Section 2.3**, the aggregate purchase price for the Purchased Assets (the "**Purchase Price**") shall be an amount as calculated below not to exceed $8,150,000.  The Purchase Price is calculated as the sum, as of the Closing Date, of the following: (i) the lesser of (x) $3,350,000 and (y) the aggregate amount outstanding under the Loans (the "**Chase Payment**"), to be paid in cash to the Prepetition Lender to satisfy the Loans; <u>plus</u> (ii) the assumption of post-petition date trade accounts payable in an amount not to exceed $1,450,000, excluding the payables referred to in clause (v) below (the "**A/P Assumption**"); <u>plus</u> (iii) the lesser of (x) $1,750,000 and (y) amounts owed to the United States Department of Agriculture in respect of allowed post–petition USDA Assessment claims (the "USDA Payment"), which USDA Payment shall be made in cash; <u>plus</u> (iv) the lesser of (x) $450,000 and (y) the budgeted outstanding and unpaid Administrative

6

Claims or costs incurred from the Petition Date through and including the Closing Date, including allowed and unpaid Professional Fees and US Trustee fees) as of the Closing Date (the "**Administrative Payment**"), which Administrative Payment shall be made in cash or escrow as of the Closing Date; plus (v) the assumption of post-petition insurance premium balances not to exceed $250,000 (the "**Insurance Payable Assumption**"); plus (vi) the lesser of (x) $900,000 and (y) any unpaid amount due to the Tobacco Tax and Trade Bureau (the "**TTB Payment**") unpaid as of the Closing Date, which TTB Payment shall be made in cash to the Tobacco Tax and Trade Bureau as of the Closing Date; plus (vii) the amount of the obligations outstanding under the DIP Facility as of the Closing Date (the "**DIP Payment**"). In no event shall the Purchase Price exceed $8,150,000 (with any assumed obligations set forth in this **Section 1.3** valued at face). For the avoidance of doubt, only the Chase Payment, the USDA Payment, the Administrative Payment, the TTB Payment and the DIP Payment shall be made in cash, with the A/P Assumption and the Insurance Payable Assumption components of the Purchase Price to be satisfied by the assumption of such obligations by the Buyer pursuant to Section 1.2 hereof. Notwithstanding the foregoing, the DIP Payment may be made by book entry (by cancelling such indebtedness) in the event that the Buyer is the lender under the DIP Facility.

Section 1.4 <u>Consent of Third Parties</u>. On the Closing Date, each of the Sellers shall assign or otherwise transfer to the Buyer, and the Buyer will assume or accept transfer of, the Purchased Assets to the extent provided in this Agreement, in each case to the extent permitted by, and in accordance with, applicable Law. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer, and shall not effect the assignment or transfer, of any Purchased Asset set forth on **Schedule 1.4** if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than the Sellers (each such action, a "**Necessary Consent**"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of the Buyer thereunder, and such Necessary Consent is not obtained, and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required. In such event, the applicable Seller and the Buyer will use Reasonable Efforts to obtain the Necessary Consent with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to the Buyer; provided, however, that neither such Seller nor the Buyer shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or to obtain any such consent or approval. If such Necessary Consent is not obtained, or if such Purchased Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of such Seller thereunder so that the Buyer would not in fact receive all such rights, such Seller and the Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which the Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting an Assumed Liability hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to the Buyer, or under which such Seller would enforce for the benefit of, and at the direction of, the Buyer, with the Buyer assuming such Seller's obligations (to the extent otherwise constituting an Assumed Liability hereunder), any and all rights of such Seller thereunder. Notwithstanding anything to the contrary set forth in this **Section 1.4**, it is understood and agreed that the Buyer's obligations to consummate the transactions set forth herein are subject to the satisfaction of the condition set forth in **Section 7.2(g)** hereof, and nothing in this **Section 1.4** shall be deemed to require any waiver of said **Section 7.2(g)**.

Section 1.5 <u>Obtaining Orders and Closing</u>.

(a) <u>Obtaining Orders</u>. Each of the Sellers shall use its best efforts to obtain entry of the Procedures Order and the Sale Order, subject to its obligations under the Bankruptcy Code.

7

(b)  Closing.  If the Sale Order is entered, then the closing of the purchase and sale of the Purchased Assets (the "**Closing**") shall take place as described in **Article VIII**; provided, that the closing conditions set forth in **Article VII** shall have been satisfied or waived in writing as provided therein at or prior to the Closing.  The date on which the Closing occurs shall be referred to in this Agreement as the "**Closing Date**."  The pre-Closing obligations of the Sellers hereunder shall be joint and several.

**ARTICLE II**
**CONSIDERATION AND MANNER OF PAYMENT**

Section 2.1     Payment of the Purchase Price.

(a)  Execution Date Payment. Within four (4) Business Days of the Execution Date, the Buyer shall deliver to Alliance Bank or as otherwise designated by Seller and reasonably acceptable to Buyer, an aggregate amount, in cash, of $815,000 (the "**Execution Date Cash Payment**"). The Execution Date Cash Payment shall be credited against the Closing Date Cash Payment, and shall be promptly returned to the Buyer (i) if the Buyer is not the successful bidder at the Auction, (ii) this Agreement is otherwise terminated (other than pursuant to Section 12.1(g) or (h)), or (iii) upon funding of the DIP Facility by the Buyer or its designee.

(b)  Provision of DIP Facility. If (i) the Buyer is the successful winner at the Auction, (ii) Closing does not occur by December 15, 2014, (iii) the Sellers shall have complied with their obligations hereunder in all material respects, and (iv) the representations and warranties of each Seller hereunder shall then be true and correct in all material respects (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period or representations qualified as to materiality, which shall be true and correct in all respects), the Buyer shall provide, or cause to be provided, debtor in possession financing on the terms set forth on **Annex A**, and otherwise on terms and conditions reasonably satisfactory to the Buyer and the Sellers (the "**DIP Facility**"), in a maximum principal amount not to exceed $3,600,000.

(c)  Closing Date Payment. Subject to the prorations described in **Section 2.3**, on the Closing Date, the Buyer shall pay to the Sellers an aggregate amount, in cash, equal to (i) the cash portion of the Purchase Price as set forth in Section 1.3, minus (ii) the Execution Date Cash Payment (the "**Closing Date Cash Payment**") by wire transfer of immediately available funds to the bank account(s) specified by the Sellers.  The Sellers shall specify such account(s) in writing at least two (2) days prior to the Closing Date.

Section 2.2     Reserved.

Section 2.3     Prorations.   At the Closing, all Real Property Taxes (including, without limitation, industrial facilities Taxes) related to the Real Property, which are billed or to be billed in the calendar year in which the Closing occurs shall be prorated and adjusted as of the Closing Date, in advance on a due date basis, and personal property Taxes (including, without limitation, industrial facilities Taxes) allocable to the Tangible Personal Property which are billed or to be billed in the year in which the Closing occurs, shall be prorated and adjusted, as of the Closing Date.  All other such Taxes that are billed on or after the Closing Date shall then be the responsibility of the Buyer.  The Sellers shall pay all special assessment installments related to the Real Property that are due and owing and would be delinquent if not paid prior to the Closing Date, and the Buyer shall pay all other special assessment installments related to the Real Property.  All rent payments, common area maintenance charges, utility bills, and other similar charges related to the Real Property shall be prorated as of the Closing Date.  With respect to any items to be prorated, including, without limitation, Taxes that have not been billed as of the

Closing, agreed upon estimates shall be used in prorations, and such estimates shall be deemed to be conclusive.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**
**OF THE SELLERS**

Each of the Sellers hereby represents and warrants to the Buyer with respect to the matters specified in this **Article III** as follows:

Section 3.1    Organization and Qualification.  Such Seller is duly organized, validly existing and in good standing under the Laws of the State of its organization as set forth on **Schedule 3.1**. Such Seller has the requisite corporate power and authority to conduct the Business as it is now being conducted. Such Seller is duly qualified to conduct its business as a foreign entity and is in good standing under the Laws of the jurisdictions listed on **Schedule 3.1**, which are all of the jurisdictions where the nature of its business or the ownership or leasing of its property requires such qualification, except for any jurisdiction where the failure to be qualified would not, individually or in the aggregate, have a Material Adverse Effect on the Business.

Section 3.2    Authorization; Enforceability.  Subject to the entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, such Seller has the requisite corporate power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, to perform its obligations under this Agreement and the Other Agreements to which it is a party, and to consummate the transactions contemplated by this Agreement and the Other Agreements to which it is a party.  Subject to the entry of the Sale Order, this Agreement has been duly executed and delivered by such Seller, and the Other Agreements to which such Seller is a party have been, or will be at the Closing, duly executed and delivered, and this Agreement and the Other Agreements, assuming the due authorization, execution and delivery in each case by the other parties hereto and thereto, and the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court, will constitute, upon such execution and delivery in each case thereof, the legal, valid and binding obligations of such Seller, enforceable in accordance with their respective terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 3.3    Organizational Documents.  Such Seller has made available to the Buyer copies of such Seller's respective Organizational Documents, and all such copies are complete and correct as of the date hereof.

Section 3.4    Capitalization.  The record stockholders of such Seller are as set forth on **Schedule 3.4**. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting Equity Interests of such Seller.

Section 3.5    No Violation.  Subject to the entry of the Sale Order and except as set forth on **Schedule 3.5** and subject to the receipt of the Consents and to the filing of notices and the expiration of any waiting periods as contemplated by **Section 3.6**, neither the execution and delivery of this Agreement or the Other Agreements to which such Seller is a party, nor the performance by such Seller of their obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby will (a) violate, conflict with or constitute a default under the Organizational Documents of such Seller, (b) to such Seller's Knowledge, materially violate, materially conflict with or result in a material breach of, constitute a material default under, give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Assigned Contract or Assigned

9

Lease, or (c) to such Seller's Knowledge, violate in any material respect any Laws applicable to such Seller or by which any of their properties are bound.

Section 3.6    Consents.

(a) Third Party Consents.    Except as set forth on **Schedule 3.6(a)**, to such Seller's Knowledge neither the execution and delivery of this Agreement or the Other Agreements to which such Seller is a party, nor the performance by such Seller of its obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, will require any Consent (collectively, the "**Third Party Consents**") under any of the terms, conditions or provisions of any Assigned Contract.

(b) Governmental Approvals.    Except for (i) approvals required to obtain new or to transfer any existing Licenses and Permits held by such Seller and listed on **Schedule 3.6(b)**, (ii) the Sale Order by the Bankruptcy Court, and (iii) any other filings listed on **Schedule 3.6(b)**, to such Seller's Knowledge no Consent of any Governmental Authority (collectively, the "**Governmental Approvals**") is required to be obtained by such Seller in connection with the execution, delivery and performance by such Seller of this Agreement and the Other Agreements to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby, which, if not obtained, (A) would result in a material violation of any Law or any assigned License or Permit, or (B) would prohibit the consummation of the transactions contemplated hereby and thereby.

Section 3.7    Taxes.  Except as set forth on **Schedule 3.7**, such Seller:

(a) Has timely filed or will timely file (taking into account available extensions of time to file), all Federal income and other material Tax Returns required to be filed by it through the date hereof with the appropriate Governmental Authority. Such Seller has timely paid and discharged all Taxes shown as due on such Tax Returns. Such Seller has withheld, collected and paid over to the appropriate Taxing Authority, or is properly holding for such payment, all Taxes required by Law to be withheld or collected;

(b) Is not a party to any Tax allocation or Tax sharing agreement, other than an agreement the principal purpose of which is not to share Taxes;

(c) Has not been notified in writing that it is currently under audit by any Taxing Authority or that any Taxing Authority intends to conduct such an audit, and no material action, suit, investigation, claim or assessment is pending or, to the Seller's Knowledge, proposed with respect to any alleged deficiency in Taxes; and

(d) Has not waived any statute of limitations in respect of any Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency.

Section 3.8    Material Contracts.  **Schedule 3.8** sets forth a list of all Contracts of such Seller and designates which such Contracts are executory Contracts.  In the event that the Buyer identifies any Contracts not listed on **Schedule 3.8** as executory Contracts (as such term is used in Section 365 of the Bankruptcy Code), then such Sellers shall amend **Schedule 3.8** to include such Contracts.  Except as set forth on **Schedule 3.8**, and except for defaults of the type referred to in Section 365(b)(2) of the Bankruptcy Code, there are no material defaults (or events that, with notice or passage of time, or both, would constitute a material default) by such Seller or, to such Seller's Knowledge, any other party to any of the Contracts. Such Seller has made available to the Buyer a copy of each written Assigned Contract. To such Seller's Knowledge, except as set forth on **Schedule 3.8** and except for defaults of the type referred to in Section 365(b)(2) of the Bankruptcy Code, (i) each Assigned Contract and Other Assigned

*PHX 331255799v15*

Contract is valid, binding, in full force and effect, and enforceable by such Seller against the parties thereto in accordance with its terms, except as such enforceability may be limited by the General Enforceability Exceptions, and to such Seller's Knowledge, is not subject to any material claims, charges, set-offs or defenses, (ii) such Seller has not waived any material rights under any of the Assigned Contracts and Other Assigned Contracts, or modified any material terms thereof.

Section 3.9    Real Property.

(a)    **Schedule 3.9** sets forth a list of all the Owned Real Property and Leased Real Property (collectively, the "**Real Property**").  Such Seller has made available to the Buyer a copy of such Seller's Leases, all of which are identified on **Schedule 3.9**.

(b)    Except as set forth on **Schedule 3.9**, such Seller owns the Owned Real Property and, assuming good title in the landlord, such Seller holds a valid leasehold interest in the Leased Real Property, in each case free and clear of all Liens, except for Liens listed or described on **Schedule 3.9**. No representation or warranty is made herein regarding the status of the fee title (and any matters pertaining to such fee title) of any Real Property; it is specifically understood and agreed that the provisions of this **Section 3.9**, as they relate to the Leased Real Property, pertain only to the leasehold interest of the Sellers. Except as set forth on **Schedule 3.9**, the Real Property constitutes all of the real property currently used or occupied by such Seller in connection with the Business.

(c)    With respect to the Real Property, except as reflected on **Schedule 3.9**:

(i)    the Seller is not a party to any agreements with owners or users of properties adjacent to any facility located on any parcel of the Real Property relating to the use, operation or maintenance of such facility or any adjacent real property which would be materially adverse to the Business;

(ii)    the Seller is not a lessor under, or otherwise a party to, any Lease pursuant to which the Seller has granted to any Person the right to use or occupy all or any portion of the Real Property; and

(iii)    the Seller has not granted any options, rights of first offer or rights of first refusal to purchase any of the Real Property or any portion thereof or interest therein.

Section 3.10    Personal Property.  Except as set forth on **Schedule 3.10** or as disposed of in the Ordinary Course of Business since the date of the Latest Balance Sheet, such Seller has good title to the Tangible Personal Property, free and clear of any Liens other than Permitted Liens. All Tangible Personal Property actually used by such Seller in the Ordinary Course of Business is in adequate working condition and repair and sufficient for the operation of the Business as presently conducted (normal maintenance, wear and tear excepted).

Section 3.11    Intellectual Property.  Except as set forth on **Schedule 3.11**, (i) with respect to any Intellectual Property owned by such Seller (as opposed to Intellectual Property of which such Seller is a licensee) and included in the Purchased Assets, such Seller has all right, title and interest to all such Intellectual Property, without any conflict known to such Seller with the rights of others, except as would not have a Material Adverse Effect, (ii) to the knowledge of such Seller, no Person other than such Seller has the right to use the Intellectual Property owned by such Seller and included in the Purchased Assets, and (iii) to the knowledge of such Seller, such Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Seller's Business that is owned by a party other than such Seller and included in the Purchased Assets. **Schedule 3.11** sets forth a complete list, as

of the date hereof, of all registered and applied for Intellectual Property owned by such Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

Section 3.12    Licenses and Permits.    **Schedule 3.12** sets forth a complete list, as of the date hereof, of all material Licenses and Permits issued to such Seller for the operation of the Business, all material Licenses and Permits applied for by such Seller or the issuance of which to such Seller is pending, and all material Licenses and Permits required for the operation of the Business which have not been issued to such Seller or applied for by such Seller or the issuance of which to such Seller is not pending.

Section 3.13    Employee Benefit Plans; Employees.    **Schedule 3.13** sets forth a list of such Seller's written Employee Benefit Plans. All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which such Seller may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service. **Schedule 3.13** sets forth a true, correct and complete list of the names, positions, work locations, hire dates, and total compensation (listing separately applicable salaries and hourly rates) of all Employees, consultants and independent contractors engaged by such Seller, and indicates which of such individuals are on disability leave or any other type of leave of absence, authorized or otherwise.

Section 3.14    Labor Relations.    Except as set forth on **Schedule 3.14** and except as would not have a Material Adverse Effect, such Seller is not a party to or bound by and has no obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization. Such Seller has not received written notice of any outstanding representation petitions involving such Seller before the National Labor Relations Board or any state labor board, and, to the Knowledge of such Seller, no such petition has been threatened, and, to the Knowledge of such Seller, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing. Such Seller is not subject to any material unfair-labor-practice charge.

Section 3.15    Environmental Matters.    Except as would not have a Material Adverse Effect, the Business and its operations of such Seller are being conducted in accordance with all applicable Laws, regulations, or other legal requirements which regulate the protection of the environment, pollution or human health and safety ("**Environmental Laws**") applicable to the Business.  Such Seller has not received notice of any Claims relating to or arising under Environmental Laws with respect to the Purchased Assets or the Business, except as set forth on **Schedule 3.15**, nor, to the Knowledge of such Seller, are any of the same being threatened against Seller or any real property owned, operated, or leased by such Seller. Such Seller has not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree which has outstanding requirements relating to or arising under Environmental Laws. To the Knowledge of such Seller, neither such Seller nor any predecessor of title at the Real Property has released any Hazardous Material into the environment at, onto, or from any property owned or leased by such Seller which would reasonably be expected to result in material liability or Claims of or against such Seller arising under any Environmental Law. This **Section 3.15** constitutes the sole and exclusive representation and warranty of such Seller regarding environmental matters and liabilities and obligations and compliance with Laws relating thereto and no other representation contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made with respect thereto.

12

PHX 331255799v15

Section 3.16    Insurance.  Such Seller maintains the insurance policies set forth on **Schedule 3.16**, which Schedule sets forth all insurance policies covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect and, except as set forth on **Schedule 3.16**, will continue in full force and effect immediately following the Closing.  Such Seller has paid all premiums on such policies due and payable prior to the Closing Date.  Such Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

Section 3.17    No Brokers or Finders.  Except as set forth on **Schedule 3.17**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, such Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

Section 3.18    Litigation; Proceedings.  Except for the Bankruptcy Case and any and all Actions arising therefrom or related thereto, and except as set forth in **Schedule 3.18**, there is no Action pending or, to the Knowledge of such Seller, threatened against or related to the Business, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Knowledge of such Seller, threatened by or before any arbitrator or any Governmental Authority.

Section 3.19    Compliance with Laws.  Except as set forth on **Schedule 3.19** and as would not (a) adversely affect the ability of such Seller to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Other Agreements or (b) otherwise have a Material Adverse Effect, such Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Licenses and Permits, and (ii) holds all material Licenses and Permits. Except as set forth on **Schedule 3.19**, such Seller has not received any written notice or other written communication from any Governmental Entity or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or License and Permit or (y) notifying such Seller of the non-renewal, revocation or withdrawal of any Licenses and Permits.  Such Seller is in material compliance with the terms of the Licenses and Permits.

Section 3.20    Accounts Receivable.  Each Accounts Receivable that constitutes a Purchased Asset is a true and correct statement of the account for goods delivered to or services actually performed for and accepted by, such account debtor in the ordinary course of business materially consistent with past practice.  Except as set forth in **Schedule 3.20**, to the Knowledge of such Seller, the debtors to whom the Accounts Receivable relate are not in or subject to a bankruptcy or insolvency proceeding, and none of the Accounts Receivable has been made subject to an assignment for the benefit of creditors.  Except as set forth in **Schedule 3.20**, there are no disputes regarding the collectability of any such Accounts Receivable and such Seller has not factored any of the Accounts Receivable.

Section 3.21    WARN Act.  Such Seller has not, within the ninety (90) days immediately prior to the Closing Date, in whole or in part taken any action or actions which would, independently of the transaction contemplated hereby, result in a plant closing or mass layoff within the meaning of the Worker Adjustment and Retraining Notification Act, or any similar Law.

Section 3.22    Full Disclosure.  Neither this Agreement nor or any other document furnished to Buyer by or at the direction of Seller (excluding any market and industry data, governmental statistics or other information, budgets, projections and proformas) expressly in connection with the sale of the Purchase Assets, contains, when taken as a whole, any untrue statement of a material fact or omits to state any fact necessary to make the factual statements therein taken as a whole not materially misleading as of

13

the time made or delivered in light of the circumstances under which it was made or furnished. Any budgets, projections and pro forma financial information furnished to the Buyer by or at the direction of the Seller for use in connection with the transactions contemplated by this Agreement were based upon good faith estimates and assumptions believed by the Seller to be reasonable at the time made, it being recognized by the Buyer that such projection as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ materially from the projected results. Seller has no Knowledge of any fact which has not been disclosed to the Buyer that reasonably could be expected to result in a Material Adverse Effect.

Section 3.23    <u>Warranties Are Exclusive</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SUCH SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE PURCHASED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Sellers as follows:

Section 4.1    <u>Organization and Qualification</u>. The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 4.2    <u>Authorization; Enforceability</u>. The Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, to perform its obligations under this Agreement and the Other Agreements to which it is a party, and to consummate the transactions contemplated by this Agreement and the Other Agreements to which it is a party. This Agreement has been duly and validly executed and delivered by the Buyer, the Other Agreements to which the Buyer is a party will be duly executed and delivered by the Buyer at the Closing, and will constitute legal, valid and binding obligations of the Buyer, enforceable in accordance with their terms and conditions, except as such enforceability may be limited by the General Enforceability Exceptions.

Section 4.3    <u>No Consents</u>. Except in connection with the Licenses and Permits, to the knowledge of the Buyer, no material Consent of, permit or exemption from, or declaration, filing or registration with, any Governmental Authority is required to be made or obtained by the Buyer in connection with the execution, delivery and performance of this Agreement by the Buyer.

Section 4.4    <u>Litigation</u>. There are no Actions pending or Threatened against the Buyer, nor is the Buyer subject to any judgment, order or decree of any court or Governmental Authority that would seek to prevent, delay or burden any of the transactions contemplated by this Agreement.

Section 4.5    <u>No Violation</u>. Subject to the receipt of approvals and to the filing of notices as contemplated by **Section 4.3**, neither the execution and delivery of this Agreement or the Other Agreements to which it is a party, nor the performance by it of the transactions contemplated hereby or thereby will (a) constitute a default under the Organizational Documents of the Buyer, or (b) result in a

14

default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, Lease or other instrument or obligation to which the Buyer is a party, or (c) conflict with or violate any Laws applicable to the Buyer or by which any of its properties is bound.

Section 4.6     <u>Available Funds</u>.  The Buyer has sufficient immediately available funds, in cash, to pay the cash portion of the Purchase Price and to pay any other amounts due and payable by it under this Agreement, together with all related fees and expenses of the Buyer, and to effect the transactions contemplated by this Agreement, all without any Consent required.

Section 4.7     <u>No Knowledge of Misrepresentations or Omissions</u>.  The Buyer has no knowledge that the representations and warranties of the Sellers in this Agreement and the Schedules hereto are not true and correct in all material respects, and the Buyer has no knowledge of any material errors in, or material omissions from, the Schedules to this Agreement.

Section 4.8     <u>Brokers</u>.  No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

**ARTICLE V**
**COVENANTS OF THE SELLERS**

Section 5.1     <u>Conduct of Business</u>.  Except as contemplated by this Agreement, and subject to changes resulting from the Sellers' Bankruptcy Case and the requirements of the Bankruptcy Code and the Bankruptcy Court, and except as set forth on **Schedule 5.1** or as otherwise consented to in writing by the Buyer (which consent may not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing, each of the Sellers shall use Reasonable Efforts to conduct the Business in all material respects in the Ordinary Course of Business, in substantially the same manner as heretofore conducted.  Subject to the terms and conditions of this Agreement, and subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, each of the Sellers shall use Reasonable Efforts to keep available the services of its present employees and preserve the goodwill, reputation and present relationships of the Business with suppliers, customers, licensors and Persons having business relations with it. The Sellers shall provide the Buyer and its authorized representatives with access at reasonable times and upon reasonable notice to the offices, properties, personnel, books and records of the Sellers in order for Buyer to make such investigation as it shall reasonably desire.  Without limiting the generality of the foregoing, each of the Sellers covenant and agree that, without the prior written consent of the Buyer, and subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, from the date hereof through the Closing, each of the Sellers shall not:

(a)    except as set forth on **Schedule 5.1(a)** hereto, (i) materially increase in any manner the base compensation of, or enter into any new bonus or incentive agreement or arrangement with, any of its employees, (ii) enter into any new employment, severance, consulting, or other compensation agreement with any of its existing employees, (iii) amend or enter into a new Employee Benefit Plan, or (iv) make or agree to make any bonus or profit sharing payments to any employee;

(b)    amend any of their Organizational Documents;

(c)    sell, lease, license, encumber or otherwise dispose of, or agree to sell, lease, license, encumber or otherwise dispose of, any of its material assets other than in the Ordinary Course of Business;

15

(d) fail to make, or delay, any capital expenditures in the Ordinary Course of Business;

(e) alter their cash management customs and practices (including, without limitation, the timing of collection of receivables and post-Petition payment of payables and other current liabilities);

(f) maintain their books and records in any way other than in the Ordinary Course of Business;

(g) incur any Indebtedness for borrowed money (other than the DIP Facility or other capital lease Indebtedness in the ordinary course of business in an aggregate amount not to exceed $5,000) or guarantee any such Indebtedness, or issue or sell any debt securities or warrants or rights to acquire any debt securities, or guarantee any debt securities of others;

(h) amend, modify, terminate or grant any waiver under any Assigned Contract;

(i) amend, modify, terminate or grant any waiver under any Assigned Lease, other than in the Ordinary Course of Business; or

(j) knowingly and intentionally take any action or omit to take any action that would cause the representations and warranties contained in **Article III** to be untrue or incorrect in any material respect.

Nothing in this Agreement shall be deemed to give the Buyer, directly or indirectly, the right to control or direct the Business or any operations of the Sellers prior to the Closing; provided, that each of the Sellers shall promptly provide Buyer all requested information concerning its operations, financial condition and Business pending Closing. Prior to the Closing, each of the Sellers shall exercise, consistent with the terms and conditions of this Agreement, exclusive control over its Business and operations.

Section 5.2  <u>Further Assurances</u>.  Each of the Sellers shall use Reasonable Efforts to take, or cause to be taken, all reasonable actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, prior to the Closing, each of the Sellers shall use Reasonable Efforts to give all material notices, make all required filings with, or applications to, Governmental Authorities and use Reasonable Efforts to obtain all Third Party Consents and Governmental Approvals necessary for the Parties to consummate the transactions contemplated hereby. Notwithstanding the foregoing, or any other provision of this Agreement, except as specifically provided in this Agreement, each of the Sellers shall not be required to expend money, incur any Liabilities, commence or become involved with any litigation or offer or grant any accommodation (financial or otherwise) to any other Person in order to obtain the satisfaction or waiver of any of the conditions set forth in **Article VII** or to allow the Parties to proceed to the Closing or to otherwise fulfill its obligations under this **Section 5.2.** With respect to the Bankruptcy Case, each of the Sellers shall use Reasonable Efforts to take the following action between the date hereof and the Closing Date:

(a)  Such Seller will promptly take such actions as are reasonably intended to obtain the Bankruptcy Court's approval of the Sale Order, including, without limitation, demonstrating that (i) the Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (ii) Section 363(f) of Bankruptcy Code shall apply to the sale of the Purchased Assets. The Buyer shall provide such Seller with all information reasonably requested by such Seller in connection with such actions.

16

*PHX 331255799v15*

Section 5.3    <u>Schedules Updates</u>.

(a) <u>Schedules Updates Generally</u>.    Prior to the Closing, each of the Sellers may supplement or amend the Schedules to this Agreement to the extent that such Seller becomes aware of any matter heretofore existing or hereafter arising which, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in such Schedules or that is otherwise necessary to correct any information in such Schedules that has been rendered inaccurate thereby.    For purposes of determining the accuracy of the representations and warranties of the Sellers contained in **Article III** and for purposes of determining satisfaction of the conditions set forth in **Section 7.2(a)**, the Schedules delivered by the Sellers shall be deemed to include that information contained therein on the date of this Agreement and also any information contained in any subsequent supplement or amendment thereto (collectively, the "**Schedules Updates**"); <u>provided</u>, <u>however</u>, that if a Seller delivers any such Schedules Updates that address or disclose any matter other than the occurrence, or non-occurrence, of any event or the existence, or non-existence, of any circumstance, occurring or arising in the Ordinary Course of Business at any time after the date of this Agreement, or any matter other than those that would not have a Material Adverse Effect, then the Buyer shall have three (3) Business Days to object thereto by delivering to such Seller a written objection notice (the "**Objection Notice**") and, if the terms and conditions of **Section 12.1(d)** and **Section 7.2(a)** would allow, to terminate this Agreement. The Objection Notice shall specify, in reasonable detail, the basis of the Buyer's objection to any Schedules Updates and the grounds for termination of this Agreement. The failure of the Buyer to deliver such Objection Notice within the prescribed time period will constitute the Buyer's acceptance of the Schedules Updates.    If the Buyer delivers an Objection Notice, then such Seller, on the one hand, and the Buyer, on the other hand, will use Reasonable Efforts and negotiate in good faith for a period of five (5) Business Days thereafter, to resolve any disagreements as to the Schedules Updates, so as to avoid a termination of this Agreement as otherwise may be permitted under **Section 12.1(d)**. In the event that the Buyer shall close the transactions contemplated hereby, the Buyer shall be deemed to have accepted the Schedules Updates, the delivery of which shall be deemed to have cured any and all breaches of representations, warranties and covenants of this Agreement that otherwise might have existed, but for the information disclosed in the Schedules Updates provided pursuant to this **Section 5.3**.

(b) <u>Updates to Schedule 1.1</u>.    Each of the Sellers may, by delivery to the Buyer, update **Schedule 1.1** and any of its subsections, which represent informational disclosures rather than exceptions to representations and warranties, from time to time between the date of this Agreement and the Closing Date, to correct typographical errors and to incorporate changes arising during such period not resulting from a breach of any covenant of such Seller set forth in this Agreement.    Absent any objection from the Buyer in writing within five (5) days following such Seller's delivery to the Buyer of such corrections (any of which objection shall be reasonably resolved by the Buyer and such Seller in good faith), such updated Schedules shall replace the corresponding Schedules delivered by such Seller on the date hereof in connection with the execution of this Agreement.

Section 5.4    <u>Reasonable Access; Confidentiality</u>.

(a) In order for the Buyer to have the opportunity to conduct its due diligence investigation regarding the Business and affairs of the Sellers from the date hereof until the Closing Date or the earlier termination of this Agreement and subject to applicable Law, each of the Sellers give Buyer and its Representatives, upon reasonable notice to such Seller, reasonable access, during normal business hours, to the assets, properties, books, records and agreements of such Seller and shall permit the Buyer to make such inspections (but excluding environmental testing and soil or groundwater sampling without such Seller's prior written consent) as it may reasonably request and to furnish the Buyer during such period with such information relating to such Seller as the Buyer may from time to time reasonably request.    Notwithstanding the foregoing or any other provision of this Agreement, (i) the Buyer shall not

have any contact with any customers or suppliers of the Seller, except to the extent that such Seller (in its sole discretion) agrees in writing to such contact, and (ii) all inspections and other actions taken by the Buyer shall be taken in a manner that does not unreasonably interfere with the operation of the Business and that strictly maintains the confidentiality of the Business and the transactions contemplated hereby. The Parties acknowledge and agree that there is no due diligence condition to the Buyer's obligations to close the transactions contemplated by this Agreement.

(b) Any information provided to or obtained by Buyer pursuant to paragraph (a) above will be subject to the Confidentiality and Non-disclosure Agreement, dated June 23, 2014, between the Sellers and Merit Consulting LLC on behalf of Buyer (the "**Confidentiality Agreement**"), and must be held by Buyer in accordance with and be subject to the terms of the Confidentiality Agreement, regardless of whether the Buyer signed the Confidentiality Agreement as the Recipient (as such term is defined in the Confidentiality Agreement). The Buyer agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Upon the Closing, the Confidentiality Agreement shall terminate with respect to the Confidential Information that constitutes part of the Purchased Assets, and the rights and obligations of the Parties with respect thereto shall be governed by the provisions of **Section 9.3** of this Agreement.

**ARTICLE VI**
**COVENANTS OF THE BUYER**

Section 6.1    Further Assurances.  The Buyer shall use Reasonable Efforts to take, or cause to be taken, all reasonable actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, prior to the Closing, the Buyer shall use Reasonable Efforts to give all material notices, make all required filings with, or applications to, Governmental Authorities and use Reasonable Efforts to obtain all Third Party Consents and Governmental Approvals necessary for the Parties to consummate the transactions contemplated hereby.  The Buyer acknowledges and agrees that this Agreement is subject to approval of the Bankruptcy Court.

Section 6.2    Notification.  Prior to the Closing, upon discovery, the Buyer shall inform the Sellers in writing of any material variances from the Buyer's representations and warranties contained in **Article IV.**  In addition, prior to the Closing, upon discovery, the Buyer shall promptly notify the Sellers if the Buyer obtains knowledge that the representations and warranties of a Seller in this Agreement and the Schedules hereto are not true and correct in all material respects, or if the Buyer obtains knowledge of any material errors in, or omissions from, the Schedules to this Agreement.

Section 6.3    Employment Covenants and Other Undertakings.

(a)    Employees. At and subject to Closing, Buyer shall offer to employ all of the Employees, including Employees on sick leave, vacation, other authorized leaves of absences or short-term disability, on the terms set forth on **Schedule 6.3(a)**, which shall include substantially the same salary, other employment terms, and employment benefits as was provided by the applicable Seller immediately prior to the Closing; provided, that, it is understood and agreed that (i) the Buyer shall not be obligated to provide any similar Employee Benefit Plan except as set forth above in this **Section 6.3(a)** and on **Schedule 6.3(a)** and (ii) the Buyer reserves the right to modify health plans and benefits provided to all its employees in its ordinary course of business. Each employment offer shall provide that such offer of employment shall take effect on the Closing Date. Any Employees who accept such offer of employment by Buyer are referred to herein as "**Transferred Employees.**" Each of the Sellers shall

18

deliver to Buyer on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as such Seller certifies in writing are exempt from such requirement). Notwithstanding the foregoing, nothing herein shall obligate Buyer to retain any Transferred Employee for any period of time after the Closing Date, except for the Management Employees pursuant to the employment contracts contemplated hereby.

(b)     **[Reserved]**

(c)     Forms W-2 and W-4. Each of the Sellers and Buyer shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under this procedure, the applicable Seller shall keep on file all IRS Forms W-4 provided by their Transferred Employees for the period required by applicable Law concerning record retention and the Buyer will obtain new IRS Forms W-4 with respect to each Transferred Employee.

(d)     Employee Communications. Prior to making any written communications to the Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, the Sellers shall provide Buyer with a copy of the intended communication.

(e)     No Third Party Beneficiaries. Without limiting the generality of **Section 14.9**, each of the Sellers and Buyer acknowledge and agree that all provisions contained in this **Section 6.3** are included for the sole benefit of the Sellers and Buyer, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any government agency or current or former employees, directors, officers or consultants of the Sellers, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Buyer or any of its Affiliates.

## **ARTICLE VII**
## **CONDITIONS PRECEDENT TO THE CLOSING**

Section 7.1     Conditions Precedent to Each Party's Obligations. The respective obligations of each Party to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the affected Party:

(a) No Legal Prohibition. No Law shall exist or be enacted or promulgated by any Governmental Authority which would prohibit the consummation by such Party of the transactions contemplated hereby.

(b) No Injunction. Such Party shall not be prohibited, by any order, ruling, consent, decree, judgment or injunction of any court, judicial authority or Governmental Authority, from consummating the transactions contemplated hereby.

(c) Effectiveness of Sale Order. The Bankruptcy Court shall have entered the Sale Order, fifteen (15) days shall have elapsed since such Sale Order was entered (provided, that if the 15th day after such Sale Order is entered is not a Business Day, such period shall be deemed to have elapsed on the first Business Day following such 15th day), and the effectiveness of such Sale Order shall not have been stayed or, if stayed, such stay shall no longer be in effect.

19

Section 7.2    Conditions Precedent to Obligations of the Buyer. The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, as of the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the Buyer:

(a)    Accuracy of Representations and Warranties; Performance of Covenants. Except as expressly contemplated by this Agreement, the representations and warranties of the Sellers contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period or representations qualified as to materiality, which shall be true and correct in all respects), except (i) to the extent of changes or developments contemplated by the terms of this Agreement and (ii) where the failure of such representations and warranties to be so true and correct does not have, and is not likely to have, individually or in the aggregate a Material Adverse Effect on the Business. Each of the Sellers shall have, in all material respects, performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by such Seller on or prior to the Closing Date and the Borrower shall be operating in the Ordinary Course of Business consistent with past practices as of the Closing Date. The Buyer shall receive at the Closing a certificate, dated as of the Closing Date and executed by such Seller's principal executive officer, certifying the fulfillment of the conditions set forth in this **Section 7.2(a)**.

(b)    Sale Hearing. Each of the Sellers shall have obtained the Procedures Order from the Bankruptcy Court by no later than October 14, 2014 scheduling the Sale Hearing to occur by no later than November 12, 2014, and scheduling the Auction to occur not more than two (2) Business Days before the Sale Hearing.

(c)    Compliance With Procedures Order; Notice. Each of the Sellers shall have complied with all requirements of the Procedures Order, including the notice requirements provided therein.

(d)    Assumption and Rejection of Contracts. The Contracts designated hereunder for assumption or rejection shall be so assumed or rejected, as the case may be, by final Order of the Bankruptcy Court satisfactory to Buyer.

(e)    Assumed Liabilities. The liabilities of each of the Sellers described in **Section 1.2(ii)**, **(vi)**, **(vii)**, and **(ix)** through **(xi)** shall not exceed the numerical thresholds set forth in such subsections.

(f)    Closing Deliveries. The Buyer shall have received, or waived delivery of, the items to be delivered pursuant to **Section 8.2**.

(g)    Licenses and Permits. The Buyer shall have received the Purchased Assets and all Licenses and Permits required, in the Buyer's reasonable discretion, to operate the Business on substantially the same terms as the Business was operated by the Sellers immediately prior to Closing.

(h)    Minimum Cash Balances. The aggregate amount of Cash on Hand and Cash Equivalents shall not be less than $1,000,000, less any USDA Payments made prior to Closing, and all payments to the TTB shall be current.

Section 7.3    Conditions Precedent to Obligations of the Seller. The obligations of the Sellers under this Agreement to consummate the transactions contemplated hereby will be subject to the

PHX 331255799v15

satisfaction, as of the Closing, of all the following conditions, any one or more of which may be waived in writing at the option of the Sellers:

(a) <u>Accuracy of Representations and Warranties; Performance of Covenants</u>. Except as expressly contemplated by this Agreement, the representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period or representations qualified as to materiality, which shall be true and correct in all respects), except (i) to the extent of changes or developments contemplated by the terms of this Agreement and (ii) where the failure of such representations and warranties to be so true and correct does not, and is not likely to materially and adversely effect the ability of the Buyer to consummate the transactions contemplated hereby. The Buyer shall have performed and complied, in all material respects, with all covenants and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing. The Sellers shall receive at the Closing a certificate, dated as of the Closing Date and executed by the Buyer's principal executive officer, certifying the fulfillment of the conditions set forth in this **Section 7.3(a).**

(b) <u>Closing Deliveries</u>. The Sellers shall have received, or waived delivery of, the items to be delivered pursuant to **Section 8.3**.

## ARTICLE VIII
## CLOSING

Section 8.1 <u>Time and Place</u>. The Closing shall take place at the offices of Greenberg Traurig, LLP, 2375 E. Camelback Road, Suite 700, Phoenix, Arizona 85016, and shall be on the day selected by the Sellers, and reasonably acceptable to the Buyer, to be no more than 10 calendar days after the satisfaction or waiver in writing of the conditions set forth in **Article VII** (other than those conditions that by their terms shall be or must necessarily be satisfied at the Closing).

Section 8.2 <u>Deliveries by the Seller</u>. At the Closing, each of the Sellers shall deliver or cause to be delivered to the Buyer:

(a) <u>Assignment and Assumption Agreement; Bills of Sale and Documents of Title</u>. A duly executed assignment and assumption agreement, warranty deeds, bills of sale, assignment of Intellectual Property, if any, and all other instruments of sale, assignment and transfer as are reasonably necessary or appropriate to sell, assign and transfer to the Buyer (and to vest in the Buyer) good and marketable title to the Purchased Assets, in recordable form, where appropriate, in form and substance reasonably acceptable to the Parties;

(b) <u>Other Agreements</u>. Executed counterparts of the Other Agreements to which such Seller is a party;

(c) <u>Authorizing Resolutions</u>. A copy of the resolutions of such Seller's board of directors, certified by the secretary of such Seller as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the Other Agreements to which such Seller is a party and the performance by the Seller of its obligations hereunder and thereunder;

(d) <u>Required Consents</u>. The Third Party Consents and Governmental Approvals set forth on Schedule 3.6(a) and 3.6(b);

21

(e) <u>Employment Agreements</u>. Employment Agreements between the Buyer and certain key management employees of such Seller, namely James Deer, James Emery, Robert Klein, Paul Marquardt, Mark Thompson, Lee Welchons and John Wertheim (the "**Management Employees**"), duly executed by each of the Management Employees, in form and substance reasonably acceptable to the Buyer and each of the Management Employees and attached hereto as **Exhibit A**, for a term of no less than three years and with substantially the same salary and terms as such Management Employee (a) received through his written employment agreement with such Seller as of the Closing Date, or (b) with respect any Management Employees without a written employment agreement with such Seller as of the Closing Date, as received under the employment terms of such Management Employee immediately prior to Closing, which are as set forth on **Schedule 8.2(e)**;

(f) <u>Sale Order</u>. A copy of the Sale Order entered on the docket of the Bankruptcy Court;

(g) <u>Compliance with the Procedures Order and the Sale Order</u>. Evidence reasonably satisfactory to Buyer of compliance with the notice provisions set forth in the Procedures Order and in the Sale Order;

(h) <u>Licenses and Permits</u>. Evidence reasonably satisfactory to the Buyer of the issuance, transfer or reissuance of the Licenses and Permits listed on **Schedule 3.12**, together with all other Licenses and Permits required to lawfully operate the Purchased Assets and conduct the Business consistent with past practices;

(i) <u>FIRPTA Affidavit</u>. A duly executed non-foreign seller affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "Foreign Person" as defined in Section 1445 of the Code;

(j) <u>Amended and Restated Escrow Agreement</u>. A duly executed escrow agreement amending and restating the NPM Escrow Agreement shall be delivered by the trustee or trustees thereunder, in form and substance reasonably satisfactory to Buyer, and notice of such amendment and restatement shall be sent to the Attorney Generals of the States claiming any interest thereunder.

(k) <u>Title to Assets</u>. Evidence reasonably satisfactory to the Buyer that the Purchased Assets, including the Real Property, are transferred free and clear of all Liens, other than Permitted Liens.

(l) <u>Other Documents</u>. Such other documents and instruments as the Buyer or its counsel shall deem reasonably necessary to consummate the transactions contemplated hereby.

Section 8.3    <u>Deliveries by the Buyer</u>. The Buyer will deliver or cause to be delivered to the Sellers:

(a) <u>The Purchase Price</u>. Payment of the Purchase Price as provided in **Section 2.1**;

(b) <u>Assumption Agreement</u>. An executed counterpart of the assignment and assumption agreement pursuant to which the Buyer shall assume all of the Assumed Liabilities, in form and substance acceptable to the Sellers;

(c) <u>Authorizing Resolutions</u>. A copy of the resolutions of the Buyer's board of directors, certified by the secretary of the Buyer as having been duly and validly adopted and being in full force and affect, authorizing the execution and delivery of this Agreement and the Other Agreements to which the Buyer is a party and the performance by the Buyer of its obligations hereunder and thereunder; and

(d) Other Documents. Such other documents and instruments as the Sellers or their counsel shall deem reasonably necessary to consummate the transactions contemplated hereby.

## ARTICLE IX
## POST CLOSING COVENANTS

Section 9.1     Access to Books and Records. From and after the Closing, the Buyer shall provide each of the Sellers and its Representatives with reasonable access (for the purpose of examining and copying), during normal business hours, to the books and records of the Buyer relating to the Business prior to the Closing date, in connection with any legitimate business purposes of such Seller, including but not limited to the preparation of tax returns, expressed to the Buyer in writing. Without affecting the generality of the foregoing, from and after the Closing Date, the Buyer shall give each of the Seller and its Representatives full access to the books and records relating prior to the Closing Date that are part of the Purchased Assets for purposes of, and relating to, the prosecution of any claims of such Seller or which may otherwise be needed to enforce such Seller's remaining rights and defend such Seller's remaining obligations relating to the Purchased Assets and the Business or in connection with Seller's Bankruptcy Case. Such Seller will promptly deliver to the Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in the Bankruptcy Case relating to this Agreement or the transactions contemplated hereby.

Section 9.2     Attorney-Client Privilege. The Parties agree to take the steps necessary to ensure that any privilege attaching as a result of legal counsel representing the Sellers in connection with this Agreement and the Other Agreements and the transactions contemplated hereby and thereby will survive the Closing and remain in effect; provided, that from and after the Closing such privilege will be controlled by the Sellers. In addition, Buyer hereby waives, on its own behalf and agrees to cause its Representatives to waive, any conflicts that may arise in connection with such counsel representing the Sellers after the Closing, including in connection with a dispute with the Buyer or the Sellers following the Closing.

Section 9.3     Confidentiality.

(a) Non-Disclosure of Confidential Information. From and after the Closing Date, each of the Sellers, on the one hand, and the Buyer, on the other hand (as such, a "**Restricted Party**") shall not, directly or indirectly, disclose or use at any time (and shall cause its Affiliates and Representatives not to disclose or use) any Confidential Information owned by the other Party (whether or not such information is or was developed by it), except to the extent that such disclosure or use is directly related to and required by the performance of its duties to the other Party or as required by Law or as otherwise provided hereunder. From and after the Closing Date, each Restricted Party further agrees to take commercially reasonable steps, to the extent within its control, to safeguard such Confidential Information owned by the other Party and to protect it against disclosure, misuse, espionage, loss and theft. In the event any of the Restricted Parties is required by Law to disclose any Confidential Information owned by the other Party, such Restricted Party shall promptly notify the other Party in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the other Party's reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law. For purposes of this Agreement, "**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to a Party's business or its suppliers, distributors, customers, independent contractors or other business relationships. Confidential Information includes the following as they relate to a Party's business and, in each case, to the extent a Party obtains a commercial benefit from the secret nature of such information: internal business information (including information relating to strategic and staffing plans and practices,

23

PHX 331255799v15

business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, the business's suppliers, distributors, customers, independent contractors or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports. Notwithstanding the foregoing, Confidential Information does not include such information which: (A) at the time of disclosure is publicly available or thereafter becomes publicly available through no act or omission of a Restricted Party; (B) is thereafter disclosed or furnished to the Restricted Party by a third party who is not known by such Restricted Party to have acquired the information under an obligation of confidentiality; (C) is independently developed by the Restricted Party without the use of or reference to Confidential Information after the Closing Date; or (D) is disclosed by the Restricted Party (subject to compliance with the applicable provisions of this **Section 9.3(a)**) under compulsion of applicable Law.

(b) Specific Performance; Injunctive Relief. Each Party acknowledges and agrees that in the event of a breach by any Party of any of the provisions of **Section 9.3(a)**, the other Party may suffer irreparable harm for which no adequate remedy at law would exist, and damages may be difficult to determine. Consequently, in the event of any such breach, the other Party or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions of **Section 9.3(a)**, without the requirement of posting a bond or proving actual damages.

Section 9.4    General.  In case at any time after the Closing any further actions are necessary or desirable to carry out the purposes of this Agreement, each of the Parties shall take such further actions (including the execution and delivery of such further instruments and documents) as the other Party may reasonably request, all at the sole cost and expense of the requesting Party.

## ARTICLE X

## TAXES

Section 10.1    Taxes Related to Purchase of Acquired Assets.

(a)    All Transfer Taxes, conveyance, recording and similar Taxes, including all such state and local Taxes, incurred in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "**Transaction Taxes**"), that are imposed solely as a result of the sale, transfer, assignment and delivery of the Purchased Assets shall be borne by Buyer, provided that, Transaction Taxes paid by Buyer shall not include any Taxes in respect of gains, income or the like and any such Taxes shall be borne by the Sellers. Buyer and the Sellers shall cooperate to (i) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (ii) provide all requisite exemption certificates and (iii) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b)    Except as set forth in **Section 10.1(a)**, and subject to **Section 1.2(a)**, on or prior to the Closing Date, the Sellers shall pay all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Purchased Assets and the Business and attributable to Tax periods or portions thereof commencing on or after the Petition Date and ending on the Closing Date; provided, however, the Sellers shall not be obligated to pay any such Tax that is disputed in good faith by the Sellers, as long as appropriate reserves have been established in accordance with generally accepted accounting principles.  Subject to **Section 1.2(a)**, all sales Taxes, use Taxes, payroll Taxes, real property

24

Taxes, personal property Taxes and other ad valorem Taxes with respect to the Purchased Assets that accrue during, or are attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date shall be paid by the Sellers. Subject to **Section 10.1(a)**, all sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Purchased Assets that both accrue and are due after the Closing Date shall be paid by Buyer. Buyer and the Sellers shall cooperate and prepare and file any and all required Tax Returns with respect to Taxes subject to this **Section 10.1(b)**. For purposes of this Agreement, whenever it is necessary to determine the liability for any such Taxes subject to this **Section 10.1(b)** for a taxable period that begins before the Closing Date and ends after the Closing Date (a "**Straddle Period**"), the Taxes for the portion of the Straddle Period ending on and including, and for the portion of the Straddle Period beginning after, the Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of calendar days during the Straddle Period before and including the Closing Date, or the number of calendar days during the Straddle Period beginning the day after the Closing Date, as applicable, and the denominator of which is the number of calendar days in the entire Straddle Period.

Section 10.2    <u>Waiver of Bulk Sales Laws</u>.  To the greatest extent permitted by applicable Law, Buyer and the Sellers hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Each of the Sellers shall cause the Bankruptcy Sale Order to exempt such Seller and Buyer from compliance with any such Laws.

**ARTICLE XI**
**SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS**

All representations and warranties of each of the Sellers and the Buyer contained in, or arising out of, this Agreement shall expire at the earlier of (a) the consummation of the transactions contemplated hereby at the Closing or (b) the termination of this Agreement in accordance with **Article XII** hereof, and thereafter no claim may be made or suit or other proceedings instituted for any breach of, or inaccuracy in, any such representation of warranty. All Pre-Closing Covenants of each of the Sellers and the Buyer will expire at Closing. All Post-Closing Covenants of the each of the Sellers and the Buyer will survive the Closing in accordance with their terms.

**ARTICLE XII**
**TERMINATION**

Section 12.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)  by the mutual written consent of the Buyer and the Sellers; or

(b)  by the Buyer in writing, without Liability of the Buyer on account of such termination (provided the Buyer is not otherwise in material default or in material breach of this Agreement), if the Closing shall not have occurred on or before March 15, 2015 (the "**Outside Date**"); or

(c)  by the Sellers in writing, without Liability of the Sellers on account of such termination (provided that the Sellers are not otherwise in material default or in material breach of this Agreement), if the Closing shall not have occurred on or before the Outside Date; or

(d)  by the Buyer in writing, if satisfaction of any of the conditions in **Section 7.1** or **Section 7.2** is or becomes impossible (other than by reason of the Buyer's failure to comply with its

25

obligations under this Agreement) and the Buyer has not waived in writing such condition on or before the Closing; or

(e) by the Sellers in writing, if satisfaction of any of the conditions in **Section 7.1** or **Section 7.3** is or becomes impossible (other than by reason of the Sellers' failure to comply with any of their respective obligations under this Agreement) and the Sellers have not waived in writing such condition on or before the Closing; or

(f) by the Buyer in writing, in the event of any material breach of this Agreement by the Sellers, which breach remains uncured thirty (30) days following written notice by the Buyer to the Sellers of such breach; or

(g) by the Sellers in writing, in the event of any material breach of this Agreement by the Buyer, which breach remains uncured thirty (30) days following written notice by the Sellers to the Buyer of such breach; or

(h) by the Sellers in writing, if Buyer is unable or unwilling to provide the DIP Facility, if applicable, which remains uncured for more than five (5) calendar days following receipt of notice by Sellers to the Buyer of such failure; or

(i) by Buyer if (i) the Procedures Order has not been entered by October 14, 2014, (ii) the Sale Order has not been entered by November 12, 2014, or if, prior to such date, the Bankruptcy Court approves another transaction involving the sale or other transfer of any of the Purchased Assets to a third party, or (iii) the Buyer is not the winning bidder in the Auction held by November 12, 2014; or

(j) by either Party following the entry of a Final Order rejecting the transactions contemplated hereby; or

(k) by either Party if the Bankruptcy Court enters an order approving an alternative transaction.

Section 12.2    Effect of Termination.

(a) Except as otherwise provided in this Agreement, in the event of termination of this Agreement pursuant to **Section 12.1**, all obligations under this Agreement shall terminate and shall be of no further force or effect and there shall be no Liability on the part of the Buyer or the Sellers to one another; provided, however, that (a) the rights and obligations of the Parties set forth in **Article XI**, this **Section 12.2** and **Article XIII**, inclusive, shall survive such termination and (b) no termination of this Agreement shall release, or be construed as releasing, any Party from any Liability to any other Party which may have arisen under this Agreement prior to termination.

(b) Notwithstanding anything to the contrary in this Agreement, in the event of termination of this Agreement pursuant to **Section 12.1**, Buyer and each of its Affiliates and Subsidiaries shall not adopt, use, assume or imply it has assumed any name incorporating "Prime Time" or "Prime Time International" in any combination or arrangement. Further, in the event of termination of this Agreement pursuant to **Section 12.1**, nothing in this Agreement is intended to grant any rights to Buyer or any of its Affiliates or Subsidiaries under any patent, mask work right, trademark, trade secret or copyright of any of the Sellers.

PHX 331255799v15

# ARTICLE XIII
## DEFINITIONS

_Definitions_.  As used in this Agreement,

"**Accounts Receivable**" of any Person means (a) all trade accounts receivable and other rights to payment from customers of such Person and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered to customers of such Person, (b) all other accounts or notes receivable of such Person and the full benefit of all security for such accounts or notes, and (c) any claim, remedy or other right related to any of the foregoing.

"**Action**" means any demand, Claim, action, suit or proceeding, arbitral action, litigation, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"**Administrative Claim**" means a claim against Seller for costs and expenses of administration of the Bankruptcy Case allowed under Sections 503(b), 507(b) or, if applicable, 1114(e)(2) of the Bankruptcy Code, including, but not limited to, the following: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the estate and operating the Business (including, but not limited to, wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and claims by Governmental Authorities for Taxes (including claims related to Taxes which accrued after the Petition Date, but excluding claims related to Taxes which accrued on or before the Petition Date); and (b) any 503(b)(9) Claims.  Notwithstanding the foregoing, "Administrative Claim" shall not include compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under Sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person.  For the purposes of this definition, a Person shall be deemed to Control another Person if such Person owns or has dispositive power over, directly or indirectly, more than twenty five percent (25%) of the voting Equity Interests of the other Person.

"**Auction**" means an auction under Section 363 of the Bankruptcy Code scheduled by the Bankruptcy Court pursuant to the Procedures Order.

"**Auction Date**" means the date of the Auction scheduled pursuant to the Procedures Order.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. section 101 et seq., commonly known as the Bankruptcy Code, as it may be amended from time to time.

"**Business Day**" means any day other than a Saturday, a Sunday or other day on which banks in Arizona are permitted or required by applicable Law to close.

"**Cash on Hand**" means all cash and Cash Equivalents, calculated as of 12:01 a.m., Eastern Time on the Closing Date, determined in accordance with GAAP.  For the avoidance of doubt, Cash on Hand shall be calculated net of issued but uncleared checks and drafts and shall include checks, ACH transactions and other wire transfers and drafts deposited or available for deposit for the account of the Person with respect to which Cash on Hand is being calculated.

"**Cash Equivalents**" means money orders and traveler checks, cash surrender value of life insurance, marketable securities or all other similar current assets.

_PHX 331255799v15_

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consent**" means any approval, consent, ratification, waiver, or other authorization.

"**Contract**" means any executory contract (as such term is used in Section 365 of the Bankruptcy Code) to which the Seller is a party (a) as of the date hereof, or (b) which is entered into by the Seller between the date hereof and the Closing Date hereof that concerns or is related to the Business, including, but not limited to, real and personal property Leases, license agreements and agreements with employees, consultants or agents.

"**Cure Amounts**" means amounts required, to the Knowledge of the applicable Seller, to cure all defaults under each of the Assigned Contracts and Assigned Leases, to permit the Buyer to assume each such Contract pursuant to Section 365 of the Bankruptcy Code.

"**Employee Benefit Plans**" means (a) all employee benefit plans as defined in Section 3(3) of ERISA; and (b) all other pension, retirement, group insurance, severance pay, deferred compensation, excess or supplemental benefit, vacation, fringe benefit and incentive plans, programs, or arrangements which pertain to any employee, former employee, director, officer or independent contractor of Seller and to which Seller is a sponsor, a party or by which it is bound.

"**Equity Interests**" means (a) any partnership interests, (b) any membership interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person or entity to purchase or otherwise acquire membership interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership interests or units, capital stock, or any other equity securities, or (g) any other interest classified as an equity security of a Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that is included in a controlled group of companies within which the Sellers are also included, as provided in Section 414(b) of the Code; or which is a trade or business under common control with the Sellers, as provided in Section 414(c) of the Code; or which constitutes a member of an affiliated service group within which the Sellers are also included, as provided in Section 414(m) of the Code; or which is required to be aggregated with the Sellers pursuant to regulations issued under Section 414(o) of the Code.

"**Final Order**" means an order of the Bankruptcy Court (a) that has not been reversed, vacated or stayed, and the time to file an appeal or a motion to reconsider has expired and is not stayed, or (b) with respect to which any appeal has been finally decided and no further appeal or petition for certiorari can be taken or granted.

"**GAAP**" means United States generally accepted accounting principles, as in effect from time to time, consistently applied.

PHX 331255799v15

"**General Enforceability Exceptions**" means those exceptions to enforceability due to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding at Law or in equity).

"**Governmental Authority**" means the United States or any state, provincial, county, municipal, city, local or foreign government, or any instrumentality, division, subdivision, department, agency or authority of any thereof having competent jurisdiction over any of the Sellers, the Buyer or the transactions contemplated by this Agreement, as applicable.

"**Hazardous Materials**" means (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"**Indebtedness**" means, with respect to any Person, all Liabilities in respect of:  (a) borrowed money; (b) indebtedness evidenced by bonds, notes, debentures or similar instruments (c) capitalized lease obligations; and (d) interest, premium, penalties and other amounts owing in respect of the items described in the foregoing clauses (a) through (d). For avoidance of doubt, and notwithstanding the foregoing, Indebtedness does not include (i) intercompany indebtedness of any Seller to or from any of its Affiliates, (ii) trade payables and expenses incurred in the Ordinary Course of Business, (iii) obligations related to Leases that are or should be (in accordance with GAAP) accounted for as operating Leases, or (iv) conditional sale and payment over time arrangements.

"**Intellectual Property**" means all of the following: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, designs, shapes, configurations, slogans, trade names, corporate names, Internet domain names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, recipes, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases, and related documentation, excluding so-called "shrink wrap" or "click wrap" software), (g) all other proprietary rights, and (h) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Inventory**" of any Person means all finished goods, all work-in-process, intermediaries and all raw materials or ingredients used or held for use by such Person.

"**IRS**" means the Internal Revenue Service of the United Stated Department of the Treasury.

"**Law**" means each provision of any currently implemented Federal, state or local or foreign law, statute, ordinance, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"**Lease**" means any lease, sublease or other Contract relating to the occupancy of any improved space on any Real Property.

PHX 331255799v15

"**Liability**" means any liability, obligation or deficiency, of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, choate or inchoate due or to become due), including without limitation any liability for Taxes.

"**Licenses and Permits**" means any licenses, permits, certificates, notifications, exemptions, classifications, registrations, franchises, approvals, orders or similar authorizations, or any waivers of the foregoing, issued by any Governmental Authority related to the Business.

"**Lien**" means any mortgage, pledge, hypothecation, hypothec, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, or charge, other than (i) restrictions on the offer and sale of securities under Federal and state securities Laws and (ii) any Permitted Liens.

"**Loss**" or "**Losses**" means, with respect to any Person, all Liabilities, demands, claims, suits, actions, or causes of action, assessments, losses, costs and expenses (including reasonable attorneys' fees) sustained or incurred by such Person; provided, however, that Losses of any Person shall not include any punitive, special or consequential damages, lost profits or diminution in value (based on a multiple of earning or otherwise).

"**Material Adverse Effect**" or "**Material Adverse Change**" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, is materially adverse to the Business, as currently conducted and as contemplated to be conducted during the pendency of the Bankruptcy Case, the Purchased Assets, the Assumed Liabilities or results of operations or condition (financial or otherwise) of the Business as currently conducted by Sellers and as contemplated to be conducted during the pendency of the Bankruptcy Case, in each case, taken as a whole; provided, however, that no change, effect, event, occurrence, state of facts or development shall be deemed (individually or in the aggregate) to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect or Material Adverse Change: (a) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to (i) the announcement or pendency of the transactions contemplated by this Agreement, (ii) conditions affecting the industry in which the Business participates, the United States economy as a whole or the capital markets in general or the markets in which the Business operates, (iii) changes in GAAP, (iv) changes in Law, rules, regulations, orders, or other binding directives issued by any Governmental Authority, (v) performance or compliance with the terms of, or the taking of any action required by, this Agreement, (vi) national or international political or social conditions, including, the commencement, continuation or escalation of a war, armed hostilities or other international or national calamity or act of terrorism directly or indirectly involving the United States of America, (vii) the filing or pendency of the Bankruptcy Case, (b) any existing event, occurrence or circumstance with respect to which the Buyer has knowledge as of the date hereof, (c) compliance with the term of, or taking of any action required by or expressly permitted by this Agreement or the Other Agreements, and (d) any adverse change in or effect on the Business of the Sellers that is cured before the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated pursuant to **Section 12.1** hereof.

"**Motion**" means the "Motion of Debtors for Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code" filed by the Seller with the Bankruptcy Court in the Bankruptcy Case, a copy of which Motion is attached to this Agreement as **Exhibit B**.

"**Order**" means any decree, injunction, judgment, order, ruling or writ of any Governmental Authority.

30

"**Ordinary Course of Business**" means, in respect of any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in this Agreement or any Other Agreement.

"**Organizational Documents**" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity; and (c) any amendment to any of the foregoing.

"**Other Agreements**" means each agreement, document, certificate and instrument being executed or delivered pursuant to this Agreement, including, without limitation, the documents and agreements to be delivered by the Parties pursuant to **Article VIII** hereof.

"**Permitted Liens**" means, collectively, (i) the non-avoidable Liens arising by operation of law described on **Schedule 13(a)** hereto, and (ii) the non-avoidable Liens on the Real Property described on **Schedule 13(b)** hereto

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Government Authority.

"**Post-Closing Covenants**" means any covenants, promises, commitments or other obligations (or any portion thereof) made or undertaken by any Party, in this Agreement or in any Other Agreement to the extent performance or fulfillment thereof is required by its terms to be accomplished after the Closing.

"**Pre-Closing Covenants**" means any covenants, promises, commitments or other obligations (or any portion thereof) made or undertaken by any Party, in this Agreement or in any Other Agreement to the extent performance or fulfillment thereof is required by its terms to be accomplished at, or prior to, the Closing.

"**Priority Claim**" means an allowed claim against the Sellers accorded priority in right of payment under Section 507(a) of the Bankruptcy Code.

"**Procedures Order**" means an order of the Bankruptcy Court substantially in the form of the "Procedures Order" attached as an Exhibit to the Motion.

"**Reasonable Efforts**" means the good faith efforts that a reasonably prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as reasonably possible, but without the requirement of incurring any material out-of-pocket expenses (other than such Party's own legal or accounting fees) or of conceding any legally enforceable rights in connection therewith.

"**Representative**" means, with respect to any Person, any director, manager, officer, employee or similar person acting in a representative capacity for such Person.

"**Sale Hearing**" shall mean a hearing of the Bankruptcy Court to consider the approval of this Agreement and the transactions contemplated hereby.

"**Sale Order**" means a final, nonappealable Order from the Bankruptcy Court, in form and substance reasonably satisfactory to the Buyer, approving the sale to the Buyer of the Purchased Assets

31

contemplated by this Agreement, under Sections 363(b), 363(f) and 365 of the Bankruptcy Code, free and clear of all Liens other than Liens created by the Buyer and the Permitted Liens, and finding, among other things, that (a) the Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, (b) the sale of Purchased Assets to the Buyer is covered by Section 1146(c) of the Bankruptcy Code, (c) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (d) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof, as provided in **Section 14.6**, and (e) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, the Sellers or any Chapter 7 or Chapter 11 trustee of the Sellers.  Further, the Sale Order shall approve and authorize the assumption and assignment of Assigned Contracts and the Assigned Leases to the extent assumable and assignable under Section 365 of the Bankruptcy Code, such that the Assigned Contracts and Assigned Leases will be in full force and effect from and after the Closing, with non-Seller parties being barred and enjoined from asserting against the Buyer, among other things, any defaults, breaches or claims (including cure claims under Section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing.

"**Seller's or Seller's Knowledge**" or "**Knowledge of the Seller or Sellers**" means any matter, fact, or thing that is, as of the date hereof or the Closing Date, actually known to the Management Employees.

"**Subsidiary**" means with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation); and the term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Tangible Personal Property**" means machinery, equipment (including office equipment), automobiles, trucks, tractors, trailers, fixtures, trade fixtures, computers and related software (including, without limitation, data processing systems, files and databases, specifications, manuals and other related information), furniture, office supplies, production supplies, spare parts, other miscellaneous supplies and other tangible property of any kind used in the Business.

"**Tax**" or "**Taxes**" means (a) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, escheat, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value-added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and (b) any amounts described in clause (a) for which any Person may be jointly or severally liable under applicable Law by virtue of its status as a member of a consolidated, affiliated, combined or unitary group of taxpayers, or (c) any amount described in clauses (a) or (b) that is payable pursuant to any tax-

32

sharing agreement or any other agreement relating to the sharing, indemnification or payment of any such amount.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement required to be filed with any Taxing Authority.

"**Taxing Authority**" means any governmental authority, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of any Taxes.

"**Threatened**" means that a demand or statement has been made in writing or any notice of commencement of an action or suit has been given in writing.

"**Transfer Taxes**" means any and all transfer, documentary, sales, use, gross receipts, stamp, value added, recording, escrow and other similar Taxes and fees (including any penalties and interest) imposed or assessed as a result of the transactions contemplated by this Agreement (including recording and escrow fees and any Real Property or leasehold interest transfer or gains Tax and any similar Tax).

"**Treasury Regulation**" means the regulations of the U.S. Department of the Treasury promulgated under the Code, as such Treasury Regulations may be amended from time to time. Any reference herein to a particular Treasury Regulation means, where appropriate, the corresponding successor provision.

"**WARN Act**" means the Worker's Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq*., and any similar state law.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices, Consents, etc.  Any notices, consents or other communications required to be sent or given hereunder by any of the Parties shall in every case be in writing and shall be deemed properly served if and when (a) delivered by hand, (b) transmitted by E-mail, or (c) delivered by Federal Express or other express overnight delivery service, or registered or certified mail, return receipt requested, to the Parties at the addresses as set forth below or at such other addresses as may be furnished in writing:

**If to the Sellers**:

2019 West Lone Cactus Drive
Phoenix, AZ 85027
Attention: Jack Wertheim
Telephone: 623.780.8600
E-mail: jwertheim@ptic.com

with a copy to:

Greenberg Traurig, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
Attention: Quinn Williams and David Cleary
Telephone: 602.445.8000
E-mail: williamsq@gtlaw.com; clearyd@gtlaw.com

33

**If to the Buyer**:

Prime Time International Acquisition, LLC
641 5th Street
Lakewood, NJ 08701
Facsimile: 732.364.3555
E-mail: mmueller@mueller-company.com

with a copy to:

Harvey Mervis
Hinman, Howard & Kattell, LLP
80 Exchange Street, PO Box 5250
Binghamton, New York 13902-5250
Telephone: 607.231.6739
Facsimile: 607.723.6605
E-mail: hmervis@hhk.com

Date of service of such notice shall be (i) the date such notice is delivered by hand or by E-mail, (ii) one Business Day following the delivery by express overnight delivery service, or (iii) three (3) Business Days after the date of mailing if sent by certified or registered mail.

Section 14.2    <u>Severability</u>.  The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of any other provision.  Upon such determination that any term or other provision is unenforceable or invalid, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a legally acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 14.3    <u>Successors; Assignment</u>.  This Agreement will be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.  The Buyer may not assign any or all of its rights and remedies hereunder to any party or more than one party without the prior written consent of the Seller or the Bankruptcy Court; provided, that no such permitted assignment may relieve the Buyer of its obligations hereunder should any such assignee fail to perform.

Section 14.4    <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of E-mail, a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 14.5    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, each of the Parties shall pay its own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the Other Agreements, and any amendments thereto.

Section 14.6    <u>Governing Law</u>.  All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by and construed in accordance with the domestic

34

laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule, except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as the Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court. After the Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Arizona.

Section 14.7    Table of Contents and Headings.  The table of contents and section headings of this Agreement are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

Section 14.8    Entire Agreement.  This Agreement, the recitals, the Schedules and the Exhibits attached hereto and the Other Agreements (all of which shall be deemed incorporated in this Agreement and made a part hereof), along with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the transactions contemplated hereby, supersede all prior discussions, understandings, agreements and representations and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any Party in connection with the negotiation of the terms hereof.  This Agreement may be modified only by subsequent instruments signed by the Parties hereto.

Section 14.9    Third Parties.   Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties to this Agreement and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement. This Agreement and all provisions and conditions hereof are intended to be, and shall be, for the sole and exclusive benefit of such Persons and for the benefit of no other Person.

Section 14.10   Disclosure Generally.   All Schedules attached hereto (and any Schedules Updates) are incorporated herein and expressly made a part of this Agreement as though completely set forth herein.  All references to this Agreement herein or in any of the Schedules shall be deemed to refer to this entire Agreement, including all Schedules.  References to any of the Schedules shall be deemed to include any Schedules Updates.  Information furnished in any particular Schedule shall be deemed to be included in all other Schedules in which the information is required to be included, if such information can reasonably be interpreted as having application to such other Schedule, notwithstanding the absence of a cross-reference contained therein.   Neither the specification of any dollar amount in any representation or warranty contained in this Agreement, nor the inclusion of any specific item in a Schedule is intended to imply that such amount, or any higher or lower amount, or the item so included or other items, are or are not material, and no Party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not included in a Schedule is or is not material for purposes of the Agreement. Unless this Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in this Agreement, nor the inclusion of any specific item in a Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course of Business, and no Party shall use the fact of the setting forth or inclusion of any such item or matter in any dispute or controversy between the Parties as to whether any obligation, item or matter not included in a Schedule is or is not in the Ordinary Course of Business for the purposes of this Agreement.

Section 14.11   Acknowledgment by the Buyer; Disclaimers.

PHX 331255799v15

(a) The Buyer acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, operations, assets, liabilities and properties of the Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied and will rely on the representations and warranties set forth herein and the results of its own independent investigation of the Purchased Assets and the Assumed Liabilities. The Buyer further acknowledges that, except as set forth in this Agreement, no promise or inducement was offered, by the Sellers or any of its Representatives, to the Buyer to consummate the transactions contemplated by this Agreement.

(b) The Buyer acknowledges and agrees that none of the Sellers, any other Person acting on behalf of the Sellers nor any of their respective Affiliates has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Sellers or the Business, except as expressly set forth in **Article III** of this Agreement. With respect to all materials that are described as having been made available or delivered to the Buyer, such materials shall be deemed to have been delivered or made available to the Buyer if the Buyer or any of its representatives or agents have been granted access to a dataroom, electronic dataroom or website in which such materials were available or by transmitting such materials to the Buyer or its representatives or agents by any other electronic means.

(c) **THE BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE BUYER IS PURCHASING THE PURCHASED ASSETS AND ASSUMING THE ASSUMED LIABILITIES "AS IS, WHERE IS," AND THAT, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE III OF THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF THE SELLER), ARE SPECIFICALLY DISCLAIMED BY THE SELLERS. THE BUYER ACKNOWLEDGES THAT IT DID NOT RELY ON ANY REPRESENTATION OR WARRANTY NOT CONTAINED IN ARTICLE III OF THIS AGREEMENT WHEN MAKING ITS DECISION TO ENTER INTO THIS AGREEMENT AND WILL NOT RELY ON ANY SUCH REPRESENTATION OR WARRANTY IN DECIDING TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

(d) In connection with the Buyer's investigation of the Sellers, the Buyer or the Buyer's Representatives has received from or on behalf of the Sellers certain projections, including projected statements of operating revenues and income from operations of the Sellers for the fiscal year ending December 31, 2014 and for subsequent fiscal years and certain business plan information for such fiscal year and succeeding fiscal years. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the accuracy or veracity of purported factual data contained therein or the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that the Buyer shall have no claim against the Sellers or any other Person with respect thereto. Accordingly, none of the Sellers makes any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the accuracy or veracity of purported factual data contained therein or the reasonableness of the assumptions underlying such estimates, projections and forecasts).

Section 14.12   <u>Interpretive Matters</u>.  Unless the context otherwise requires, (a) all references to Articles, Sections, Schedules or Exhibits shall mean and refer to Articles, Sections, Schedules or Exhibits in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning

PHX 331255799v15

assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, (d) the term "including" shall mean "including without limitation" (*i.e.*, by way of example and not by way of limitation), (e) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations, (f) references to "hereof", "herein", "hereby" and similar terms shall refer to this entire Agreement (including the Schedules, Schedules Updates and Exhibits hereto) (g) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of a Governmental Authority, Persons succeeding to the relevant functions of such Person), (h) references to "records" shall refer to all information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, (i) "or" is used in the inclusive sense of "and/or," and (j) whenever this Agreement refers to a number of days, such number shall refer to calendar days, unless such reference is specifically to "Business Days."

Section 14.13    Construction.    Each of the Parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it is of no application and is hereby expressly waived by the Parties hereto.

Section 14.14    Specific Performance.    The Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise breached, irreparable harm would occur, no adequate remedy at law would exist, and damages would be difficult to determine. Accordingly, it is agreed that the Party or Parties not in breach shall be entitled to an injunction or injunctions to prevent breaches of this Agreement, and to the remedy of specific performance of the terms and conditions hereof, in addition to any other remedies that may be available, at law or in equity, by reason of such breach.

Section 14.15    Press Releases and Communications.    Following the Closing, any Party hereto may issue a press release or public announcement regarding this Agreement or the transactions contemplated herein; provided, that any such press release or public announcement shall not describe, include or otherwise refer to the economic terms of the transactions contemplated by this Agreement, and provided, further, that the other Party gives its prior written consent to such press release or public announcement.

**[Signature Page Follows]**

PHX 331255799v15

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first written above.

**SELLERS**:

**PRIME TIME INTERNATIONAL COMPANY, INC.**

By:
Name: John T. Wertheim
Title: Chairman + CFO

**USA TOBACCO DISTRIBUTING, INC.**

By:
Name: John T. Wertheim
Title: Chairman + CFO

**21ST CENTURY BRANDS, LLC**

By:
Name: John T. Wertheim
Title: Chairman + CFO

**BUYER**:

**PRIME TIME INTERNATIONAL ACQUISITION LLC**

By:
Name:
Title:

Signature Page to Asset Purchase Agreement

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first written above.

**SELLERS:**

**PRIME TIME INTERNATIONAL COMPANY, INC.**

By: _____
Name: _____
Title: _____

**USA TOBACCO DISTRIBUTING, INC.**

By: _____
Name: _____
Title: _____

**21ST CENTURY BRANDS, LLC**

By: _____
Name: _____
Title: _____

**BUYER:**

**PRIME TIME INTERNATIONAL ACQUISITION LLC**

By: _~~signature~~_____
Name: _Moshe Mueller_____
Title: _EP_____

# APPENDIX A

## OUTLINE OF TERMS AND CONDITIONS OF DEBTOR IN POSSESSION FINANCING

*The following contains material terms and conditions of financing to be funded by Prime Time International Acquisition, LLC pursuant to the Asset Purchase Agreement between Prime Time International Company, 21st Century Brands, LLC, and USA Tobacco Distributing, Inc. and Prime Time International Acquisition, LLC dated September 24, 2014 (the "Purchase Agreement").*

**Borrowers:**   Prime Time International Company, 21st Century Brands, LLC, and USA Tobacco Distributing, Inc., in their capacity as debtors and debtors-in-possession in cases filed under Chapter 11 of the United States Bankruptcy Code (collectively, the "Borrowers").

**Lender:**   Prime Time International Acquisition, LLC or its designee (the "Lender").

**Venue:**   United States Bankruptcy Court for the District of Arizona

**Credit Line:**   Up to $3,600,000.00 (the "DIP Facility").

**Use of Proceeds:**   Under the DIP Facility, the Borrowers shall incur advances and use the proceeds thereof solely as follows: (a) upon entry of a final order approving the DIP Facility, repay in full the Borrower's outstanding indebtedness to J.P. Morgan Chase in the approximate amount of **$3,350,000.00**; and (b) $400,000.00, which shall be used first to pay amounts outstanding and payable to USDA.

**Security:**   The DIP Facility will be entitled to superpriority administrative expense claim status and will be secured by a first priority perfected security interest in the equity of each of the Borrowers and in all of Borrowers' assets, including all real and personal property, whether now owned or hereafter acquired, and, subject to entry of a Final Order, any avoidance actions of the Borrowers under Sections 544, 545, 547 through 551 and 553(b) of the Bankruptcy Code.

**Termination Date:**   The earliest to occur of: (a) the sale of assets in the Borrowers' Chapter 11 cases; or (b) June 15, 2015.

**Interest Rates:**   11.0%.

**Performance Covenant:**   Borrowers shall: (a) maintain a collateral amount in terms of eligible accounts receivable and inventory in excess of the amount borrowed at all times. Eligible accounts receivable is defined as all trade receivables of Prime Time International Company, USA Tobacco Distributing, Inc. and 21st Century Brands, LLC less any amounts over 90 days past due. Eligible inventory is defined as all inventory less parts, packaging and any finished goods inventory over 18 months old. The advance rate against eligible accounts receivables and inventory is 75%; and (b) report and certify the collateral position of the borrowers in accordance with (a) above by the 15th of each month.

PHX 331274080v3

**Events of Default:** Any one or more of the following events shall constitute an event of default: (a) if the Borrowers fail to pay when due and payable, or when declared due and payable, all or any portion of the obligations consisting of principal, or interest due the Lender under the DIP Facility; (b) if the Borrower fails to comply with the Performance Covenants.

**Remedies:** After June 15, 2015, if the sale transaction contemplated by the Purchase Agreement has not closed and the parties have not agreed to extend the termination date, upon the occurrence of an Event of Default and following the giving of five business days' notice to the Borrowers, the Agent shall have relief from the automatic stay and may foreclose on all or any portion of the security for the DIP Facility and apply the proceeds thereof to the obligations arising under the DIP Facility and otherwise exercise remedies against the security for the DIP Facility permitted by applicable non-bankruptcy law.

**Governing Law:** State of Arizona